# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

VICTOR KALID JACOBO RAMIREZ, MICHEL GUEVARA ALCANTAR, *on behalf of themselves and others similarly situated*,

    Plaintiffs-Petitioners,

v.

MARKWAYNE MULLIN, *et al*.,[1]

    Defendants-Respondents.

Case No. 2:25-cv-02136-RFB-MDC

**ORDER GRANTING PARTIAL SUMMARY JUDGMENT**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of Homeland Security Markwayne Mullin is substituted for currently named Kristi Noem; Daren K. Margolin, Director of the Executive Office for Immigration Review, is substituted for Sirce Owen; Ruben Leyva, Acting Field Office Director of the Salt Lake City Field Office of Immigration and Customs Enforcement, Enforcement and Removal Operations, is substituted for Jason Knight.

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................... 4

II.   PROCEDURAL HISTORY....................................................................................... 9

III.  STANDARD OF REVIEW ....................................................................................... 10

IV.   STATUTORY FRAMEWORK UNDER THE INA........................................... 11

   A.   Section 1226 – "Apprehension and detention of aliens" ..................................... 12

   B.   Section 1225 – "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing"......................................................... 15

V.    FACTUAL BACKGRUOND.................................................................................... 16

   A.   The Challenged Policies ...................................................................................... 16

   B.   Named Plaintiffs .................................................................................................. 18

VI.   DISCUSSION ............................................................................................................. 18

   A.   Jurisdiction........................................................................................................... 18

   B.   Review of Agency Action as "Not in Accordance with Law" APA § 706(2)(A) 19

   C.   The Lawfulness of Defendants' Policies Under the INA ..................................... 20

      1.   Statutory Text and Structure ............................................................................ 20

      i.   Section 1225 Governs Inspection at the Border .............................................. 22

      ii.  Class Members are not 'Seeking Admission' Under § 1225(b)(2)(A)............. 29

      iii. Section 1226 Applies to Class Members .......................................................... 36

      iv.  Defendants Create Unnecessary Conflict Between §§ 1225 and 1226......... 39

      2.   Legislative History and Purpose ....................................................................... 41

      3.   Constitutional Avoidance................................................................................... 46

      i.   Due Process....................................................................................................... 46

ii. Fourth Amendment ............................................................................... 47

4.    Agency Practice and Major Questions............................................. 52

D.    Scope of Relief................................................................................. 55

E.    Final Judgment Pursuant to Rule 54(b) ............................................ 57

F.    Notice to Class Members.................................................................. 57

**VII. CONCLUSION ............................................................................ 58**

Before the Court is Plaintiffs-Petitioners' (ECF No. 74) Motion for Partial Summary Judgment. For the following reasons, the Court grants the Motion, issues a classwide declaratory judgment, and sets aside the challenged agency policies pursuant to § 706(2)(A) of the Administrative Procedure Act. See 5 U.S.C. § 706(2)(A).

## I.    INTRODUCTION

Plaintiffs-Petitioners ("Plaintiffs" or "Class Members") are a certified class[2] of noncitizens[3] living in the United States without lawful status, whose arrest by Immigration and Customs Enforcement ("ICE") occurred or will occur in the interior of the country, not while they were arriving at its borders. They are or will be in removal proceedings before an immigration court in the District of Nevada based on a charge by the Department of Homeland Security ("DHS") that they entered the U.S. without inspection at the border. Plaintiffs contend they are being systemically misclassified by Defendants-Respondents ("Defendants" or "the government") as subject to a provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225(b)(2)(A), that mandates detention during the pendency of removal proceedings without the opportunity for release on bond. This misclassification is based on nationwide policies by Defendants DHS and the Department of Justice ("DOJ"), adopted in July 2025, based on a reinterpretation of § 1225(b)(2)(A) that upends the longstanding, settled understanding of the INA by all three branches of government.[4]

[2] The Certified Class is defined as follows:

All noncitizens in the U.S. without lawful status (1) who are or will be arrested or detained by ICE; (2) who are or will be in removal proceedings before an Immigration Court within the District of Nevada; (3) whom DHS alleges or will allege to have entered the United States without inspection or parole; (4) who are not or will not be subject to detention under 8 U.S.C. §§ 1226(c), 1225(b)(1), or 1231 at the time they are scheduled for or request a bond hearing; and (5) whose most recent arrest by ICE occurred inside the United States and not while arriving in the United States.

[3] In this Order, the Court uses the term "noncitizen" as equivalent to the statutory term "alien," as defined by the INA, 8 U.S.C. § 1101(a)(3). See Torres v. Barr, 976 F.3d 918, 922 n.6 (9th Cir. 2020)

[4] Notably, this includes the first Trump Administration and the current Trump

- 4 -

Plaintiffs seek partial summary judgment and corresponding classwide relief on their claims that the government's new detention policies are unlawful under the INA and its implementing regulations. Through the instant Motion, they seek a final determination of a question of statutory interpretation: whether the challenged policies are unlawful as applied to them because: (1) they are properly detained under 8 U.S.C. § 1226(a) (Ground I); (2) they are thus entitled to consideration for release on bond and/or supervisory conditions under § 1226(a)'s implementing regulations—*i.e.*, 8 C.F.R. §§ 236.1, 1236.1 & 1003.19 (Ground II); and (3) Defendants' policies of denying them consideration for release on bond under 8 U.S.C. § 1225(b)(2)(A) are not "in accordance with law" (*i.e.*, the INA and its regulations) and must therefore be "set aside" under § 706(2)(A) of the Administrative Procedures Act ("APA") (Ground III). See Plaintiffs' Petition for Writ of Habeas Corpus and Class Action Complaint 17–20, ECF No. 1 [hereinafter "Pls.' Compl."]. Plaintiffs also claim that the policies are "arbitrary and capricious" under the APA (Ground III) and violate their due process rights under the Fifth Amendment (Ground IV), but they do not currently seek summary judgment on those claims. See id.; Plaintiffs' Motion for Partial Summary Judgment 4, ECF No. 74 [hereinafter "Pls.' Mot."] ("Plaintiffs request that the Court grant class-wide partial summary judgment on Counts I, II, and III as they relate to claims that Defendants' policies violate the INA and its regulations.").

At bottom, the government's new statutory interpretation avows that, in amending the INA through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress fundamentally altered a core, more than century-old, distinction that "runs throughout immigration law": a noncitizen who has entered and established their presence within our country, even if unlawfully, is entitled to protections under the Constitution that do not extend to those seeking entry at its borders. Zadvydas v. Davis, 533 U.S. 678, 693 (2001); cf. Yamataya v. Fisher, 189 U.S. 86, 100–101 (1903); Leng May Ma v. Barber, 357 U.S. 185, 187 (1958). In essence, the Executive Branch now asserts that in 1996, Congress ended this bedrock principle of U.S. immigration law with regards to the liberty of millions of noncitizens living in the U.S. who entered

Administration, at least as of January 20, 2025. See Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (distinguishing between "all aliens seeking admission to the United States" and those "who are already in the United States.").

without being inspected and admitted or paroled into the country. Through a long extant statute—which has never been interpreted this way—the government contends that Congress gave the Executive unprecedented power to arrest and detain anyone in the country who cannot demonstrate they are "clearly and beyond a doubt entitled to be admitted" to the satisfaction of an ICE officer. 8 U.S.C. § 1225(b)(2)(A). It must be emphasized that Defendants' claim this authority to detain people for months, or even years, based on civil, not criminal, violations of the law. In fact, the government claims Congress has *required* the Executive Branch to detain millions of people, many of whom have lived here for decades as neighbors, spouses, mothers, fathers, and grandparents of American citizens.

Defendants assert this unprecedented detention authority arises from the clear text of § 1225(b)(2)(A); specifically, they allege that a noncitizen living in the U.S. who entered unlawfully—even if decades ago—is perpetually "an alien seeking admission" to the country. 8 U.S.C. § 1225(b)(2)(A). Through this novel interpretation, which comes thirty years after IIRIRA was enacted, the Trump Administration has suddenly discovered that Congress enacted "the largest detention initiative in American history" without a whisper as to its scale and implications in the INA's legislative history, including in statutory amendments enacted as recently as January of last year. Buenrostro-Mendez v. Bondi, 166 F.4th 494, 520 (5th Cir. 2026) (Douglas, J., dissenting). But, throughout the history of U.S. immigration enforcement, such extraordinary arrest and detention authority has been limited to inspection and apprehension at the border—of noncitizens *seeking to enter* the country. Nonetheless, Defendants claim that Congress secretly enacted a seismic shift in our laws, such that, "for purposes of immigration detention, the border is now everywhere," and for decades, five presidential administrations have violated that supposed mandate, but no one noticed. See id. Unsurprisingly, Defendants' policies enforcing this newly claimed mass detention authority—authority that is unrestrained by any procedural protections to ensure the government has a legitimate justification for depriving individuals of their liberty—have led to a flood of habeas petitions before this Court[5] and other federal courts

---

[5] The Court's Order certifying the class in this case cataloged over sixty cases in which the Court granted individualized habeas relief to Class Members. See Order Granting Class

across the country.[6] But only a fraction of detainees have accessed the resources necessary to file federal habeas petitions, necessitating class actions like this one.[7]

This Court has already exhaustively considered the relevant statutory provisions and found that the government's interpretation of § 1225(b)(2)(A) is unlawful. See generally Escobar Salgado v. Mattos, 809 F. Supp. 3d. 1123 (D. Nev. 2025). As of March 24, 2026, 410 district judges have similarly rejected the government's statutory reading while 41 have found in the government's favor.[8] Among the higher courts, a circuit split appears to be emerging. A divided Seventh Circuit panel considered the statutory question on an interim basis and found the government "was not likely to succeed" on the merits "[b]ased upon the text and structure of [§§ 1225 and 1226]." Castañon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048, 1061 (7th Cir. 2025). Subsequently, a divided Fifth Circuit panel adopted the government's interpretation. See Buenrostro-Mendez, 166 F.4th at 498–508. Most recently, a divided Eighth Circuit panel followed the Fifth Circuit's lead. Avila v. Bondi, --- F.4th ---, No. 25-3248, 2026 WL 819258 (8th Cir. Mar. 25, 2026). The statutory question has been argued and submitted before the Ninth Circuit and is set for expedited resolution. See Rodriguez Vazquez v. Bostock, No. 25-6842 (9th Cir. Mar. 4,

---

Certification 2 n.1, ECF No. 71. Since that February 5, 2026 Order, the Court has granted habeas relief in more than fifty additional cases by Class Members. See Appendix A (collecting cases).

[6] See Kyle Cheney, Our running list of judges who have ruled on ICE's mass detention policy, POLITICO (Feb. 18, 2026, 5:00 AM EST) (last updated Mar. 24, 2025, 4:45 PM EST), https://www.politico.com/news/2026/02/18/trump-judges-immigration-detention-00784614?_sp_pass_consent=true (last visited March 26, 2026) (collecting rulings from 410 federal district judges in thousands of cases across the country that have rejected the government's new detention policy, while 41 federal judges have found in favor of the government's position).

[7] At a March 17, 2026, Status Conference, the parties indicated there are hundreds of potential class members currently detained in Nevada. A supervisory ICE officer for Enforcement and Removal Operations testified that approximately 65 additional individuals are arrested and detained in Nevada detention centers each week. See ECF No. 93. But since Defendants' policies were enacted in July 2025, only a fraction of Class Members have managed to file federal habeas petitions in the District of Nevada. See supra note 3.

[8] See supra, n. 6.

2026), Dkt. No. 60. Appeals are pending in nearly every circuit.[9]

In its Opposition, the government offers no dispute of fact or binding authority to support its position that this Court should depart from its previous ruling in Escobar Salgado and in this case, where the Court granted preliminary relief based on Named Plaintiffs' likelihood of success on their statutory claim. See Order Granting Preliminary Injunction 11–13, ECF No. 35 ("As it did in Escobar Salgado, the Court rejects [Defendants'] statutory interpretation here and finds Plaintiffs . . . are detained under § 1226(a) and its implementing regulations.") (citing Escobar Salgado, 809 F. Supp. 3d at 1143–58). Instead, the government incorporates the reasoning of the Fifth Circuit majority and insists this Court should reverse course and follow that nonbinding decision. As discussed below, the Court is not persuaded by Buenrostro-Mendez for many of the reasons adroitly identified by the Honorable Dana Douglas in dissent, and by a growing number of district courts who have since carefully considered and rejected the majority's interpretation. See Buenrostro-Mendez 166 F.4th at 508–521 (Douglas, J., dissenting); see also, e.g., Carbajal v. Wimmer, No. 2:26-CV-00093, 2026 WL 353510 (D. Utah Feb. 9, 2026); Singh v. Baltazar, No. 1:26-CV-00336-CNS, 2026 WL 352870 (D. Colo. Feb. 9, 2026). Likewise, the Court finds the dissent of the Honorable Ralph R. Erickson, see Avila, 2026 WL 8919258 at *6–8, more persuasive, and more consistent with principled statutory construction, than the reasoning of the Eighth Circuit majority, which largely mirrors that of the Fifth Circuit. See id. at *2–6 (citing Buenrostro-Mendez, 166 F.4th at 502–508).

Thus, for the reasons discussed in detail below, the Court continues to find that the government's reading of § 1225(b)(2)(A), and its unprecedented mass detention policies flowing from that interpretation, violate the INA. Plaintiffs are therefore entitled to classwide relief that

---

[9] The Court is aware of pending appeals regarding this statutory issue in every circuit but the D.C. Circuit, with arguments held or calendared in the Second, Sixth, Seventh and Eleventh Circuits, and more forthcoming. See Guerrero Orellana v. Moniz, No. 25-2152 (1st Cir.); Barbosa Da Cunha v. Lyons, No. 25-3141 (2d Cir.); Buele Morocho v. Warden Phila. FDC, Nos. 26-1150 & 26-1454 (3d Cir.); Lopez Garcia v. Guadian, Nos. 25-7044 & 25-7050 (4th Cir.); Pizarro Reyes v. Raycraft, No. 25-1982 (6th Cir.); Cirrus Rojas v. Olson, No. 25-3127 (7th Cir.); Santillan Quiroz v. Noem, No. 26-6019 (10th Cir.); Hernandez Alvarez v. Warden, Fed. Det. Ctr., Miami, Nos. 25-14065 & 14075 (11th Cir.).

returns them to the position they were in before Defendants adopted these policies in July of 2025—*i.e.*, subject to detention under § 1226(a) and entitled to that provision's substantial procedural protections, including eligibility for release on bond.

## II.    PROCEDURAL HISTORY

The Court assumes the parties' familiarity with the record and proceedings in this case and recites only the procedural history most relevant to the instant Motion. On October 30, 2025, class representatives Victor Kalid Jacobo-Ramirez and Edgar Michel Guevara-Alcantar ("Named Plaintiffs") filed their Verified Petition for a Writ of Habeas Corpus and Class Action Complaint. ECF No. 1. On November 6, 2025, Named Plaintiffs concurrently filed a Motion for Preliminary Injunction and Motion for Class Certification. ECF Nos. 15, 18. After full briefing and a hearing, see ECF Nos. 22, 23, 26, on November 24, 2025, the Court granted Named Plaintiffs' Motion for Preliminary Injunction and ordered Defendants to (1) immediately release Plaintiff Jacobo-Ramirez on the bond conditions previously ordered by an immigration judge and (2) provide a bond hearing pursuant to 8 U.S.C. § 1226(a) to Plaintiff Guevara-Alcantar by December 1, 2025. See ECF No. 35. The Court also preliminarily enjoined Defendants from continuing to deny Named Plaintiffs release on bond on the asserted basis that they are subject to mandatory detention pursuant to 8 U.S.C. § 1225(b)(2). See id. Plaintiff Jacobo-Ramirez was released on bond on November 24, 2025, and, after a Court-ordered bond hearing, Plaintiff Guevara-Alcantar was released on bond on December 4, 2025. See ECF Nos. 41, 42, 44.

On November 11, 2026, the Court set a briefing schedule on class certification and set a deadline for Defendants to file an answer or motion to dismiss in response to the Class Action Complaint. See ECF No. 24. After an extension, see ECF No. 37, on December 3, 2025, Defendants filed their "Response" to the Class Action Complaint, which made arguments for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as well as on the merits of Plaintiffs' statutory claim. See ECF No. 39. After full briefing and a hearing on class certification and Defendants' dismissal arguments, see ECF Nos. 32, 38, 55, 59, 60, on February 5, 2026, the Court denied dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),

granted class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and appointed class counsel. See ECF No. 71. The Court certified the following class:

> All noncitizens in the U.S. without lawful status (1) who are or will be arrested or detained by ICE; (2) who are or will be in removal proceedings before an Immigration Court within the District of Nevada; (3) whom DHS alleges or will allege to have entered the United States without inspection or parole; (4) who are not or will not be subject to detention under 8 U.S.C. §§ 1226(c), 1225(b)(1), or 1231 at the time they are scheduled for or request a bond hearing; and (5) whose most recent arrest by ICE occurred inside the United States and not while arriving in the United States.

Id. The Court further found that notice to Class Members regarding this action and any forthcoming classwide relief was appropriate pursuant to Federal Rule of Civil Procedure 23(c)(2)(A) and ordered Plaintiffs to file any proposed notice by February 13, 2026—with a deadline for Defendants' opposition to the proposal, if any, by February 18, 2026. See id. Defendants did not file an opposition.

On February 13, 2026, Plaintiffs filed the instant Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 74. On March 3, 2026, Defendants filed their Opposition. ECF No. 87. On March 5, 2026, Plaintiffs filed their Reply. ECF No. 88. On March 6, 2026, the Court held a hearing on the Motion and indicated its preliminary ruling in Plaintiffs' favor, with the instant written Order to follow. ECF No. 89. On March 19, 2026, Plaintiffs filed an amended notice to be issued to Class Members upon issuance of this Order. ECF No. 95. To date, Defendants have not lodged any objection to Plaintiffs' proposed notice.

### III.   STANDARD OF REVIEW

A party may move for partial summary judgment by identifying part of a claim on which summary judgment is sought. See Fed. R Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. A fact is material if it "might affect the outcome of the suit under the governing law." Eat Right Foods Ltd. v. Whole Foods Mkt., Inc., 880 F.3d 1109, 1118 (9th Cir. 2018) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247 (1986)). In determining whether a genuine dispute of fact exists, the Court must "view the evidence in the

light most favorable to the nonmoving party and make all reasonable inferences in favor of that party." Eat Right Foods, 880 F.3d at 1118 (citing Tolan v. Cotton, 572 U.S. 650, 660 (2014)).

The moving party bears the initial "burden of demonstrating the absence of a genuine issue of material fact." Hollis v. R&R Restaurants, Inc, 159 F.4th 677, 683 (9th Cir. 2025) (citing Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986)). If the moving party meets their initial burden, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp. Securities Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex, 477 U.S. at 325).  If the opposing party fails to challenge the facts asserted by the moving party in the manner required by Federal Rule of Civil Procedure 56(c), the court may deem the undisputed facts admitted for purposes of the motion and grant summary judgment "if the motion and supporting materials—including the facts considered undisputed— show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3); see Beard v. Banks, 548 US 521, 527 (2006).

## IV.    STATUTORY FRAMEWORK UNDER THE INA

Under the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq., two statutory provisions generally govern the government's authority to civilly detain noncitizens during the pendency of removal proceedings: 8 U.S.C. §§ 1225(b) and 1226. The interpretation of these two provisions is the central issue at the heart of Plaintiffs' statutory and regulatory claims. The Court thus begins with the statutory framework of those two provisions as interpreted by the Supreme Court and Ninth Circuit.

Jennings v. Rodriguez, 583 U.S. 281 (2018), provides an explication of the relevant statutory provisions. See id. at 289. In Jennings "the primary issue" before the Supreme Court was "the proper interpretation of §§ 1225(b), 1226(a), and 1226(c)." Id. at 289.[10] In outlining the

_____

[10] In Buenrostro-Mendez, the Fifth Circuit majority discounted the Supreme Court's clear explication of § 1225 and § 1226 in Jennings as *dicta*. See id., 166 F.4th at 505. As did the Eighth Circuit majority. See Avila, 2026 WL 819258 at *5 (discounting the Supreme Court's interpretation of "§ 1225 to apply to aliens detained at the border and § 1226 to aliens detained in

interaction between §§ 1225 and 1226, the Court explained § 1225 generally governs "at the Nation's borders and ports of entry, where the Government must determine whether an alien *seeking to enter the country* is admissible." Id. at 287 (emphasis added). In contrast, § 1226 "generally governs the process of arresting and detaining" noncitizens already "*inside the United States.*" Id. at 288 (emphasis added); see also Rodriguez Diaz v. Garland, 53 F.4th 1189, 1196 (9th Cir. 2022) ("8 U.S.C. § 1226, provides the general process for arresting and detaining aliens who are present in the United States and eligible for removal.").

**A. Section 1226 – "Apprehension and detention of aliens"**

Section 1226 is titled "Apprehension and detention of aliens." 8 U.S.C. § 1226(a). Section 1226(a), which Plaintiffs assert governs their detention, is titled "[a]rrest, detention, and release," and provides:

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on—
>
> (A) bond of at least $ 1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
>
> (B) conditional parole; but
>
> (3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

the interior" in Jennings as "general background information" and nonbinding *dicta*) (citations omitted). However, the opinion in Jennings constitutes a clear explication of the relevant statutory provisions and their interplay. Given the Supreme Court's assertion that the central issue before it was the proper interpretation of §§ 1225(b), 1226(a), and 1226(c), that explication should not be so readily cast aside. In any case, in the Ninth Circuit, considered *dicta* from the Supreme Court is treated with appropriate deference "as prophecy of what that Court might hold." United States v. Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (citations omitted).

- 12 -

Section 1226(a) thus "sets out the general rule" regarding the arrest, detention and release of "aliens present in the country" "who are believed to be subject to removal." Nielsen v. Preap, 586 U.S. 392, 396 (2019). It generally gives the Secretary of Homeland Security[11] "discretion either to detain the alien or to release him on bond or parole." Id. at 397. The Secretary has delegated that power to the Department of Homeland Security and the immigration courts through regulation. Id. (citing 8 CFR §§ 236.1(c)(8) and (d)(1), 1003.19, 1236.1(d)(1)).

ICE can arrest and take into custody an individual under § 1226(a) upon "the issuance of" a "notice to appear" commencing removal proceedings or any time during the pendency of those removal proceedings through the authority of an administrative "Form I-200, Warrant of Arrest" which may only be issued and served by certain designated supervisory immigration officers. See 8 C.F.R §§ 236.1(b); 287.5(d); 287.8(c)(2)(i)-(ii). "When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination." Rodriguez Diaz, 53 F.4th at 1196 (citing 8 C.F.R. § 236.1(c)(8)). "The noncitizen will be released if they 'demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.'" Id.

If ICE denies bond or conditional parole and continues to detain a noncitizen, that noncitizen is afforded "substantial procedural protections" under § 1226(a) and its implementing regulations. Rodriguez Diaz, 53 F.4th at 1196.  First, "a detainee may request a bond hearing before an [immigration judge ("IJ")] at any time before a removal order becomes final." Id. at 1197. (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19). "If at this hearing the detainee demonstrates by the preponderance of the evidence that he is not 'a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk,' the IJ will order his release." Id. (quoting Matter of Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006); citing Matter of Barreiros, 10 I. & N. Dec. 536, 537–38 (B.I.A. 1964)).

---

[11] Although the text of § 1226 refers to the Attorney General, "Congress has empowered the Secretary to enforce the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., though the Attorney General retains the authority to administer removal proceedings and decide relevant questions of law." Nielsen, 586 U.S. at 397 n.2. (citing 6 U.S.C. §§ 202(3), 251, 271(b), 542 note, 557; 8 U.S.C. §§ 1103(a)(1) and (g), 1551 note).

"The IJ considers various factors in making this determination, including the individual's ties to the United States as well as his employment history, criminal record, history of immigration violations, and manner of entry into this country." Id. (citing Matter of Guerra, 24 I. & N. Dec. at 40). "The IJ also decides whether bond or other conditions on the alien's release are appropriate." Id. (citing 8 U.S.C. § 1226(a)(2)). "The detainee may be represented by counsel and can submit evidence in support of" eligibility for bond. Id. (citing 8 C.F.R. § 1003.19(b); Matter of Fatahi, 26 I. & N. Dec. 791, 792 (B.I.A. 2016)). The noncitizen "can also appeal an adverse [bond] decision to the [Board of Immigration Appeals ("BIA")]." Id. (citing 8 C.F.R. § 236.1(d)(3)). To the extent the noncitizen asserts the bond determination was constitutionally deficient, legally erroneous, or an abuse of discretion, it is subject to judicial review in habeas. See generally Martinez v. Clark, 124 F.4th 775 (9th Cir. 2024). Further, "an individual detained pursuant to § 1226(a) may request an additional bond hearing whenever he experiences a material change in circumstances." Rodriguez Diaz, 53 F.4th at 1196 (citing 8 C.F.R. § 1003.19(e)). "The same procedures apply to this new hearing, and its outcome is also appealable to the BIA." Id.

"Section 1226(c), however, carves out a statutory category of aliens who may not be released under § 1226(a)." Jennings, 583 U.S. at 289; see also Nielsen, 586 U.S. at 398 ("[W]hile 8 U.S.C. § 1226(a) generally permits an alien to seek release . . . that provision's sentence on release states that all this is subject to an exception that is set out in § 1226(c)."). Section 1226(c), "was enacted as part of [IIRIRA], and it sprang from a 'concern that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers.'" Nielsen, 586 U.S. at 398 (quoting Demore v. Kim, 538 U.S. 510, 513 (2003)). "To address this problem, Congress mandated that aliens who were thought to pose a heightened risk be arrested and detained without a chance to apply for release on bond or parole." Id. Section 1226(c) thus mandates the detention of any noncitizen "who falls into one of several enumerated categories involving criminal offenses and terrorist activities." Jennings, 583 U.S. at 289; see 8 U.S.C. 1226(c)(1)(A)-(E). "ICE may only release a person detained pursuant to [§ 1226(c)] if necessary for witness protection purposes." Rodriguez Diaz, 53 F.4th at 1189 (citing § 1226(c)(2)); Jennings, 583 U.S. at 289).

Among the individuals subject to this mandatory detention provision are noncitizens who are deemed "inadmissible" under § 1182, see 8 U.S.C. §§ 1226(c)(1)(A), (D), (E), and noncitizens who are "deportable" under § 1227, see id., §§ 1226(c)(1)(B), (C), (D).  Several of these categories were added in January 2025, through passage of the Laken Riley Act. Pub. L. No. 119-1, §§2, 3(b), 139 Stat. 3, 4 (2025); 8 U.S.C. § 1226(c)(1)(E). Specifically, the Laken Riley Act amendment mandates detention for an individual who is inadmissible under either §§ 1182(a)(6)(A) (for noncitizens present in the U.S. without being admitted or paroled), 1182(a)(6)(C) (misrepresentation), or 1182(a)(7) (lacking valid documentation) and who has been arrested for, charged with, or convicted of certain crimes. See 8 U.S.C. § 1226(c)(1)(E)(i)-(ii).

**B. Section 1225 – "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing"**

Section 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." 8 U.S.C. § 1225. As characterized by the Ninth Circuit, § 1225(b) "supplements § 1226's detention scheme." Rodriguez Diaz, 53 F.4th at 1197. Section 1225(a), titled "Inspection" defines "aliens treated as applicants for admission." 8 U.S.C. § 1225(a)(1). As relevant here, "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival) . . . shall be deemed for purposes of this chapter an applicant for admission." Id. Under § 1225(b)(1), an applicant for admission "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" is "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process." Rodriguez Diaz, 53 F.4th at 1197 (citing Jennings, 583 U.S. at 287 (quoting 8 U.S.C. § 1225(b)(1)(A)(i)). "But if the alien applies for asylum and has a credible fear of persecution, 'the alien shall be detained for further consideration of the application.'" Id. (citing 8 U.S.C. § 1225(b)(1)(B)(ii)). "All other applicants for admission are covered by § 1225(b)(2), which 'serves as a catchall provision,' and which mandates detention 'if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted.'" Id. (first citing Jennings, 583 U.S. at 287, then quoting U.S.C. § 1225(b)(2)(A)).

Although § 1225(b) generally mandates detention, applicants for admission detained under §§ 1225(b)(1) and (b)(2)(A) "may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit'" at the arresting ICE officer's discretion. Jennings, 583 U.S. at 288 (citing 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5). "Such parole, however, 'shall not be regarded as an admission of the alien.'" Id. (quoting 8 U.S.C. § 1182(d)(5)(A)). A § 1182(d)(5)(A) parolee is eligible for certain benefits not available to noncitizens released on conditional parole under § 1226(a), including ceasing to accrue unlawful presence time, see 8 U.S.C. § 1182(a)(9)(B)(ii), and the ability to apply for adjustment of status under § 1255(a). See Ortega-Cervantes v. Gonzales, 501 F.3d 1111, 1119 (9th Cir. 2007) ("Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A) and thus become eligible for adjustment of status."). Importantly, "[t]hat Congress did not similarly limit the Attorney General's discretion under § 1226(a) strongly suggests that Congress did not view 'conditional parole' [under § 1226(a)(2)(B)] as the equivalent of "parole into the United States" under § 1182(d)(5)(A) and thus as a path to lawful permanent residence under § 1255(a)." Id.

## V.    FACTUAL BACKGRUOND

In their Opposition, Defendants have not addressed Plaintiffs' assertion of undisputed material facts, as required by Federal Rule of Civil Procedure 56(c) and this Court's Local Rules. See United States District Court District of Nevada Local Rule of Practice ("LR") 56-1 ("Motions for summary judgment and responses thereto must include a concise statement setting forth each fact material to the disposition of the motion that the party claims is or is not genuinely in issue, citing the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other evidence on which the party relies."). The Court thus finds the following facts admitted for purposes of this Motion and supported by the record. See Fed. R. Civ. P. 56(e)(2).

### A.  The Challenged Policies

Prior to July 2025, DHS, ICE, and the Las Vegas Immigration Court considered anyone who entered the United States without inspection to be subject to detention under 8 U.S.C. §

1226(a) unless that person was subject to the expedited removal provisions of 8 U.S.C. § 1225(b)(1), or the detention provisions of § 1226(c) or § 1231. Pls.' Mot. 5, Statement of Undisputed Material Facts, ECF No. 74 (citing Declaration of Michael Kagan, Esq. ¶¶ 31-33, ECF No. 18-1 [hereinafter "Kagan Decl."]). This interpretation has been consistent during the nearly thirty years that IIRIRA has been in effect and aligns with statements published by the DOJ shortly after enactment clarifying that noncitizens arrested inside the United States have access to bond hearings pursuant to § 1226(a), while mandatory detention pursuant to § 1225(b)(2) applies only to noncitizens detained while arriving at or near the border. Id. (citing Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("[I]nadmissible aliens, except for arriving aliens, have available to them bond redetermination hearings before an immigration judge . . . This procedure maintains the *status quo*."); id. at 10313 ("Several sections of the statute, such as sections 212(a)(9), 240B, and 241 of the Act, refer to arriving aliens, even though this term is not defined in statute. After carefully considering these references, the Department felt that the statute seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States.").

On July 8, 2025, Acting ICE Director Todd Lyons issued a memo ("the July 8th Memo") announcing that DHS, "in coordination with the Department of Justice," reversed course, and directed its personnel nationwide to classify previously bond-eligible detainees under § 1226(a) as ineligible for bond under § 1225(b)(2)(A) if they originally entered the country without inspection. Pls.' Mot., Ex. 1 at 2-3, ECF No. 74-1. The policy outlined in the July 8th Memo is the official formal nationwide policy of DHS and DOJ. Pls. Mot. 5 (citing Hr'g. Tr. at 7:23-24, Dec. 18, 2025, ECF No. 61). The Memo provides, "[f]or custody purposes, these aliens are now treated in the same manner that 'arriving aliens' have historically been treated." Pls.' Mot., Ex. 1 at 2, ECF No. 74-1. The July 8th Memo further instructs ICE personnel not to issue any "Form I-286, Notice of Custody Determination" to such noncitizens, because such initial custody determinations are only required under 8 U.S.C. § 1226 and its implementing regulations. Id. at 3 (citing 8 C.F.R. § 236.1(c)(8)).

On September 5, 2025, the BIA issued a precedential decision, Matter of Yajure Hurtado, 29 I. & N. Dec. 216 (BIA 2025) [hereinafter "Hurtado"], which adopted the policy captured in the July 8th Memo and legally binds all immigration judges (IJs). Pls.' Mot. 6, ECF No. 74. Hurtado announced "just as Immigration Judges have no authority to redetermine the custody of arriving aliens who present themselves at a port of entry, they likewise have no authority to redetermine the custody conditions of an alien who crossed the border unlawfully without inspection[.]" Hurtado, 29 I. & N. at 228.

Pursuant to the agency policies adopted in the July 8th Memo and Hurtado, it is undisputed in this case that Class Members are routinely and systemically misclassified and detained without any consideration for bond or conditional release by ICE or the immigration court. Pls.' Mot. 6, ECF No. 74 (citing Kagan Decl. ¶¶ 32-36, ECF No. 18-1 (IJs in Las Vegas Immigration Court "no longer conduct bond hearings for [noncitizens] who entered without inspection and now hold they lack jurisdiction to hear such requests because they are bound by the decisions of the BIA.")).

**B. Named Plaintiffs**

Plaintiffs Victor Kalid Jacobo-Ramirez and Edgar Michel Guevara-Alcantar are both longtime residents of the United States who were subjected to § 1225(b)(2)(A) mandatory detention pursuant to Defendants' new policies until this Court issued preliminary injunctive relief. Pls.' Mot. 7, ECF No. 74 (citing Kagan Decl. ¶¶ 8, 18, 20, 24). Both Plaintiffs entered the United States without inspection as minors many years ago and have since built their lives here with their U.S. citizen children and loved ones. Id. (citing Kagan Decl. at ¶¶ 8, 9, 13, 20, 28). They do not have criminal records disqualifying them from consideration for bond under § 1226(c). Id. (citing Kagan Decl. at ¶¶ 10, 11, 14, 26). Their experiences are representative of the class. Id. (citing Order Granting Motion to Certify Class 34–35, ECF No. 71 [hereinafter "Class Cert. Order"]).

**VI.   DISCUSSION**

**A. Jurisdiction**

In their Opposition, Defendants incorporate the arguments they raised in their Response to Plaintiffs' Class Action Complaint, which assert this Court lacks jurisdiction over Plaintiffs'

claims under 8 U.S.C. § 1252. See Defendants' Opposition to Pls.' Mot. for Partial Summ. J. 21 [hereinafter "Defs.' Opp'n"], ECF No. 87 (citing Defendants' Response to Class Action Complaint 22–26, ECF No. 39 [hereinafter "Defs.' Resp. to Compl."]). The Court already confirmed its jurisdiction in its Order denying dismissal under Federal Rule of Civil Procedure 12(b)(1) and granting class certification. See Class Cert. Order 12–24, ECF No. 71. As this Court previously found, 8 U.S.C. § 1252(g), (b)(9), and (e)(1)(B) do not strip this Court of jurisdiction over Plaintiffs' claims. See id. The Court incorporates its previous finding by reference here. Id.

### B. Review of Agency Action as "Not in Accordance with Law" APA § 706(2)(A)

The Court also rejects Defendants' arguments that Plaintiffs' APA claim fails as a matter of law, as it did in its Order denying dismissal under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). See Defs.' Opp'n 21, ECF No. 87; Class Cert. Order 24–27, ECF No. 71. The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." Franklin v. Massachusetts, 505 U.S. 788, 796 (1992). With limited exceptions, judicial review under the APA is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Judicial review is available to any "person suffering legal wrong because of [the] agency action, or adversely affected or aggrieved by [such] action." Id. § 702. As relevant here, the APA requires courts to "hold unlawful and set aside agency action" if they find such action to be "not in accordance with law." Id. § 706(2)(A). Whether agency action is "not in accordance with law" is a question of statutory interpretation, rather than an assessment of reasonableness under arbitrary and capricious review. See Singh v. Clinton, 618 F.3d 1085, 1088 (9th Cir. 2010) (Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency, 537 F.3d 1006, 1014 (9th Cir.2008)).[12]

The Court previously considered and rejected Defendants' arguments that the challenged policies are unreviewable under the APA and found that Plaintiffs state a claim under § 706(2)(A): Defendants' policies are "not in accordance with law," *i.e.*, unlawful under the INA and its

---

[12] Thus, the Court need not address at this time Defendants' arguments asserting the July 8th Memo and Hurtado are not arbitrary or capricious under § 706(2)(A), because Plaintiffs do not move for summary judgment on that aspect of their APA claim.

implementing regulations. See Class Cert. Order 24–27, ECF No. 71. The Court incorporates that finding by reference here.

To reiterate, the July 8th Memo, which Defendants have confirmed is a uniform, nationwide policy that was effective upon issuance, is a final agency action reviewable under the APA. Id. at 25 (citing Garro Pinchi v. Noem, No. 25-CV-05632-PCP, 2025 WL 3691938, at *20 (N.D. Cal. Dec. 19, 2025) ("Acting Director Lyons's internal memorandum conclusively establishes that DHS had a written policy as to the meaning of § 1225(b)(2) as of July 2025."). Defendants do not contest this. Likewise, the Court finds, and Defendants do not contest, that the BIA's precedential decision in Hurtado is a final agency action reviewable under the APA. Id. (citing Judulang v. Holder, 565 U.S. 42, 52–53 (2011) (holding a BIA policy encapsulated in precedential decisions was reviewable under the APA, 5 U.S.C. § 706(2)(A)). The Court likewise incorporates its previous finding that the APA's exception for action committed to agency discretion under § 701(a)(2) does not prevent this Court's review of the challenged policies. See Class Cert. Order 25–26, ECF No. 71 (citing 5 U.S.C. § 701(a)(2)).

**C. The Lawfulness of Defendants' Policies Under the INA**

The Court now turns to the statutory question at the center of this case: whether Class Members are subject to detention under § 1226(a) as they contend, or § 1225(b)(2)(A), as the July 8th Memo and Hurtado contend. For the sake of efficiency, the Court incorporates by reference its statutory analysis in Escobar Salgado, 809 F.Supp.3d at 1134–58. Below, the Court reiterates its statutory construction and reaffirms it even after carefully considering new arguments raised by the government, which are largely based on the Fifth Circuit majority's reasoning in Buenrostro-Mendez, 166 F.4th 494. To the extent the government incorporates by reference its previous arguments made in its "Response to Verified Petition for a Writ of Habeas Corpus and Class Action Complaint," see ECF No. 39, and those arguments are not explicitly addressed herein, the Court finds its discussion in Escobar Salgado resolves them.

**1. Statutory Text and Structure**

The first step of statutory interpretation is interpreting the plain meaning of the statute's text. Esquivel-Quintana v. Sessions, 581 U.S. 385, 391 (2017) ("We begin, as always, with the

text."). "Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." Caminetti v. U.S., 242 U.S. 470, 485 (1917). However, the INA is a "dense statute" with "complex provisions" and "[d]ivining its meaning is ordinarily not for the faint of heart." Torres v. Barr, 976 F.3d 918, 923 (9th Cir. 2020). As such, where, as here, the text is somewhat ambiguous, a court must "use every tool at [its] disposal to determine the best reading of the statute." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 400 (2024).

The Court finds the INA is not entirely pellucid regarding the interaction and application of §§ 1225 and 1226 to Class Members. The government contends that the plain language of § 1225(b)(2) requires DHS to detain all noncitizens like Plaintiffs, who are present in the U.S. without admission or parole and subject to removal proceedings, regardless of how long they have been in the country or how far from the border they are apprehended. See Defs.' Opp'n 9, ECF No. 87. But this Court finds that the government reads § 1225(b)(2)(A) as a fragment of statutory text in isolation. Yet, "[s]tatutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" Sturgeon v. Frost, 577 U.S. 424, 438 (2016) (quoting Roberts v. Sea-Land Servs., Inc., 566 U.S. 93, 101 (2012)).

The Court finds the government's reading of the statutory text inapposite for several reasons. First, the government distorts the statutory text, including terms of art specially defined by Congress. Second, the government isolates and abstracts the phrases it favors in § 1225(b)(2)(A) from their context within § 1225 and the statutory scheme, while rendering language it finds inconvenient within § 1225(b)(2)(A) both contrary to ordinary meaning and needless surplusage. Finally, the government's interpretation unnecessarily renders provisions of § 1226(c) superfluous in all but the rarest cases, unjustifiably construes Congress' addition of § 1226(c)(1)(E) through the 2025 Laken Riley Act to be utterly ineffectual, and creates unnecessary tension between the relevant provisions, §§ 1225 and 1226.

The Court cannot accept such a fraught interpretation when a reading devoid of such conflict, which gives each statutory phrase and section independent meaning and force, is far more

plausible. Specifically, Plaintiffs' proffered reading—which aligns with the clearly stated understanding of both the Supreme Court and the Ninth Circuit, see Jennings, 583 U.S. at 287; Rodriguez Diaz, 53 F.4th at 1196—treats the statute as "a symmetrical and coherent regulatory scheme" which fits "all parts into a harmonious whole." Perez-Guzman v. Lynch, 835 F.3d 1066, 1074 (9th Cir. 2016) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)). In sum, as illustrated below, Defendants assert the phrase "applicants for admission" in § 1225(b)(2)(A) must be interpreted "to the outer limits of its definitional possibilities," even where that broad sweep "sits uncomfortably with common usage" of its surrounding terms and "disrupts [the INA's] careful structure." United States v. Corrales-Vazquez, 931 F.3d 944, 950 (9th Cir. 2019) (citing Abuelhawa v. United States, 556 U.S. 816, 820 (2009) (citation omitted)). But this Court is duty bound to reject the government's broad construction where the narrower meaning of § 1225(b)(2)(A) proffered by Plaintiffs "make[s] sense rather than nonsense out of the *corpus juris*." Maslenjak v. United States, 582 U.S. 335, 345 (2017) (citation omitted).

### i. Section 1225 Governs Inspection at the Border

First, turning to § 1225(a)(1), titled "aliens treated as applicants for admission," the Court agrees that, read in isolation, Plaintiffs clearly fall into the definition of "applicants for admission" as noncitizens "present in the United States who ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission."). However, interpreting that specially defined phrase within the context of its surrounding language and the statutory scheme clarifies that "the phrase 'applicant for admission' is a term of art denoting a particular legal status" and the fact that Class Members occupy that "fictive legal status for purposes of removal proceedings" does not mean they are subject to *inspection* and *detention* as contemplated in § 1225(b)(2)(A). Torres v. Barr, 976 F.3d 918, 927 (9th Cir. 2020); see also Biden v. Texas, 597 U.S. 785, 803 (2022) (evaluating statutory structure and context to inform interpretation of § 1225(b)(2)).

In interpreting § 1225, the Ninth Circuit held that it governs "[t]he responsibilities of officials with respect to noncitizens *at the border*" and "§ 1225(a)(1) is solely about people *seeking admission* to the country." Al Otro Lado v. Executive Office for Immigration Review, 138 F.4th

1102, 1118 (9th Cir. 2025), cert. granted sub nom. Noem v. Al Otro Lado, 146 S. Ct. 604 (2025) (emphasis added). In accord with the Ninth Circuit, as discussed below, the Court finds the phrase "applicant for admission" when read in context, rather than in isolation, makes clear that § 1225 "governs the obligations of *border* officials to process noncitizens." Id. (emphasis added).

First, take the word "inspection" which permeates § 1225. Section 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." Section 1225(a), where the term "applicant for admission" is defined, is also titled "[i]nspection," suggesting that § 1225(a)(1), which is titled "aliens treated as applicants for admission" encompasses noncitizens treated as applicants for admission *for the purpose of inspection*. See Dubin v. United States, 599 U.S. 110, 120-21 (2023) ("The title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (citation and quotation marks omitted).

Similarly, § 1225(a)(3), also titled "[i]nspection" provides all noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States *shall be inspected* by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). Significantly, § 1225(d) is titled "[a]uthority related to inspections" and § 1225(d)(2) sets forth the scope of an immigration officer's "[a]uthority to order detention and delivery of arriving aliens." Id. § 1225(d)(2). This provision seems to circumscribe an immigration officer's authority to order detention of a noncitizen and "deliver the alien to an immigration officer for inspection" under § 1225 to "arriving aliens."[13] Id. § 1225(d)(2)(B). That subsection makes no reference to an inspecting immigration officer's authority to detain noncitizens like Class Members, who are apprehended in the interior of the country having already entered its borders. Finally, the specific subsection at issue here, § 1225(b) is titled "[i]nspection of applicants for admission."

---

[13] The INA's enacting regulations define "arriving alien" as follows: "[t]he term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport." 8 C.F.R. § 1001.1.

Id. § 1225(b). For the following reasons, the Court finds the word "inspection" as it is used throughout § 1225, and in § 1225(b) specifically, describes a specific process that only occurs at or near the border when a noncitizen is seeking entry or apprehended shortly after unlawful entry into the country (*i.e.* upon arrival)—rather than a process that occurs when an ICE officer apprehends an individual in the interior and inquires as to their lawful or unlawful presence.

The INA defines "admission" as "the lawful *entry* of the alien into the United States after *inspection* and authorization by an immigration officer." 8 U.S.C. § 1101(a)(12)(A) (emphasis added). While the statute does not define the term "entry," the Ninth Circuit has "long understood this term to refer to 'coming from outside' into the United States." Torres, 976 F.3d at 924 (citing United States ex rel. Claussen v. Day, 279 U.S. 398, 401 (1929); United States v. Yong Jun Li, 643 F.3d 1183, 1186–88 (9th Cir. 2011) (explaining that [the Ninth Circuit continues] to construe the INA to incorporate Claussen's conception of "entry")). Class Members here are charged as being inadmissible, *i.e.* ineligible for a visa or admission, as "[i]llegal entrants" due to their status as being "present in the United States" "without being admitted or paroled." See 8 U.S.C. § 1182(a)(6)(A)(i). As the statutory definition of "admission" clarifies, a noncitizen cannot be present "without being admitted" unless they have already *entered* the country unlawfully, *i.e.,* without *inspection and authorization* by an immigration officer. See 8 U.S.C. § 1101(a)(12)(A). Taken together, the use of the term "inspection" in § 1225 denotes a process that occurs at or near the border, when a noncitizen is seeking entry or in the process of entering (*i.e.* arriving) in the country.

The INA does not specifically define "inspection," but where that term is used elsewhere in the statute, its usage supports the above-described construction. See Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning."). Under § 1255, for instance, a noncitizen "who was *inspected* and admitted or paroled into the United States" is eligible for adjustment of status to lawful permanent resident. 8 U.S.C. § 1255(a) (emphasis added). Thus, generally, noncitizens "who entered the country without *inspection* are ineligible to seek adjustment to lawful permanent status." Chan v. Reno, 113 F.3d 1068, 1071 (9th Cir. 1997) (emphasis added) (citing

8 U.S.C. § 1255(a) ("The status of an alien who was *inspected and admitted or paroled* into the United States may be adjusted . . . to that of an alien lawfully admitted for permanent residence[.]") (emphasis added)). Congress made an exception to this general rule for noncitizens "physically present in the United States" "who entered the United States without *inspection*" and meet certain additional requirements. Id. (quoting 8 U.S.C. § 1255(i)) (emphasis added). Satisfying those additional requirements "only confers the right to apply" for adjustment of status. Guevara v. Holder, 649 F.3d 1086, 1093 (9th Cir. 2011). But a noncitizen who entered without inspection cannot assert eligibility for adjustment of status simply by claiming that they were "inspected" by an ICE agent in Las Vegas or elsewhere in the interior such that they do not qualify as being present without inspection under § 1225(i)(1)(A)(i). The adjustment of status requirements contained in the text of § 1255 therefore support construing the meaning of "inspection" in that provision as referring to a process that occurs at the border. And, under accepted principles of statutory interpretation, that meaning should extend to the interpretation of the term "inspection" as it is used in § 1225. See Powerex Corp., 551 U.S. at 232.

This construction of "inspection" as temporally and geographically limited to the border is further bolstered by that term's use in other provisions of the INA.  Section 1325(a)(2) makes it a crime for "[a]ny alien" to "elude[ ] examination or *inspection* by immigration officers[.]" United States v. Corrales-Vazquez, 931 F.3d 944, 946 (9th Cir. 2019) (quoting 8 U.S.C. § 1325(a)(2)) (emphasis added). In Corrales-Vazquez, the Ninth Circuit considered whether any noncitizen "who crosses into the country at a non-designated time or place is guilty of 'eluding examination or inspection by immigration officers' under § 1325(a)(2)." Id. The Court held the term "'inspection' refers to background screening, searches, and other prerequisites for admission" by reference to its use in § 1225, and specifically §§ 1225(a)(3), (d). Id. at 948 n.4. The Court held that "as a literal matter" the phrase "eludes examination or inspection by immigration officers" in § 1325(a)(2) could be read so as to encompass anyone who "entered the United States without examination or inspection" but that "basic interpretive principles" such as "the presumption that statutory language is not superfluous" and that specific phrases must be read within their context and place "in the overall statutory scheme" demonstrated that § 1325(a)(2) concerns only "conduct occurring

at a designated port of entry that is open for inspection, where 'examination [and] inspection of immigration officers' take place." Id. at 948–53.

In divining the meaning of § 1325(a)(2), the Ninth Circuit relied on the meaning of the phrase "examination or inspection by immigration officers" at the time of the phrase's origins in 1929, because Congress left that phrase unchanged in subsequent amendments to the INA. Id. at 948. Based on its original meaning, the Court held "the crime of 'elud[ing] examination or inspection by immigration officers' can be committed only *where and when examinations or inspections take place*—at open ports of entry." Id. at 948 (emphasis added). The Court also referred to the meaning of inspection under § 1225, and noted "an immigration inspection can technically occur anywhere *along the border* and at any time" because any noncitizen "'who arrives in the United States'—whether or not at a designated port of arrival—is 'deemed . . . an applicant for admission' and all 'all applicants for admission . . . shall be inspected by immigration officers[.]'" Id. at 948 n.4 (first quoting 8 U.S.C. § 1225(a)(1), then § 1225(a)(3)). The Court specifically contemplated inspection under § 1225 as geographically and temporally limited: as a process performed by a "border patrol agent" who discovered a noncitizen near the border, which can occur under § 1225 "hours or perhaps days after the alien crossed into the United States." Id.

Returning to § 1225(b), the above-described usage of the term "inspection" in other provisions of the INA suggests "inspection" of "applicants for admission" as contemplated in § 1225(b) is similarly geographically and temporally limited, *i.e.*, a process that occurs when a noncitizen is seeking to *enter* the country, at or near the border. Cf. Al Otro Lado, 138 F.4th at 1119 (finding § 1225(a)(1) and its surrounding statutory text indicate "that Congress did not intend to impose strict limits on which noncitizens *at the border* must be inspected.") (emphasis added). As such, the notion that an ICE officer conducting removal operations in the interior is engaging in "inspection of applicants for admission" under § 1225(b) stretches "the statutory text beyond its breaking point" when that phrase is read in the context of its surrounding language and the statutory scheme. Torres, 976 F.3d at 926.

Consistent with the above construction of "inspection," the Court now focuses on the specific mandatory detention provision relied on by the government, § 1225(b)(2)(A), and finds

that it only applies in the border context. Section 1225(b)(2)(A) does not simply state that an "applicant for admission" "shall be detained" for failure to prove their admissibility; rather it reads: "[i]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (referring to removal proceedings under 8 U.S.C. § 1229a). The provision thus restricts its reach to 1) a noncitizen "who is an applicant for admission" who is also 2) "an alien seeking admission" and 3) questioned by "an examining immigration officer" in the context of "inspection." Id. The language of these conditions suggests a moment in time when a noncitizen is seeking to cross, crossing, or has recently crossed a border, not an indefinite status that applies whenever and wherever a noncitizen is apprehended by an immigration officer and charged with inadmissibility. See Al Otro Lado v. Wolf, 952 F.3d 999, 1011–12 (9th Cir. 2020) ("the use of the present progressive, like use of the present participle, denotes an ongoing process.") (citation omitted); see also Carr v. United States, 560 U.S. 438, 448 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach.").

That this provision is only applicable in the border context is further enforced by the statutory history,[14] where "§ 1225(b)(2)(A) is the descendant of the statutory provisions that have historically governed detention of noncitizens arriving at the borders for well over a hundred years, whereas § 1226 stems from newer-interior detention laws." Buenrostro-Mendez, 166 F.4th at 513 (Douglas, J., dissenting); see Barco Mercado v. Francis, 811 F.Supp.3d 487, 500 (S.D.N.Y. 2025) (describing an "unbroken chain of granting discretion to immigration authorities to release noncitizens [living in the United States] pending final removal decisions," beginning with the Immigration and Nationality Act of 1952). The statutory text and its history indicate Congress sought to preserve this distinction. For example, pre-IIRIRA, § 1225 was titled "Inspection by

---

[14] "Statutory history refers to the changes in the text of a statute when it is subsequently amended by Congress. That is not to be confused with legislative history, which relates to the various legislative materials and reports produced when a bill is passed by Congress." Alaska Dept. of Fish and Game v. Fed. Subsistence Bd., 139 F.4th 773, 786 n.11 (9th Cir. 2025).

immigration officers" and 1225(b) stated "[e]very noncitizen . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained[.]" 8 U.S.C. § 1225(b) (1995). An "examining immigration officer" thus referred to officers conducting inspections at the border, *i.e.* "the port of arrival." Id. And where the phrases "inspection by immigration officers" and "examining immigration officer" in § 1225(b) have "remained unchanged" throughout statutory amendments of the relevant provision since they were first used in 1952, they "presumptively retain[ ] [their] original meaning." Corrales-Vazquez, 931 F.3d at 948 (citing Whitfield v. United States, 574 U.S. 265 (2015)).

This suggests that "inspection" by an "examining immigration officer" under § 1225(b)(2)(A) is a process that occurs, as it always has, at the border. See id. That Congress removed the phrase "ports of arrival" through the IIRIRA amendments is consistent with the Ninth Circuit's interpretation of § 1225, and § 1225(a)(1) specifically, as amended to ensure there are no "strict limits on which noncitizens *at the border* must be inspected." Al Otro Lado, 138 F.4th at 1119 (emphasis added). In other words, Congress preserved § 1225 as a border provision, but expanded the categories of noncitizens subject to inspection to ensure "an immigration inspection can technically occur anywhere along the border and at any time" such that a noncitizen apprehended near the border, or between ports of entry, after crossing without admission would be subject to inspection under § 1225(b)(2)(A). Corrales-Vazquez, 931 F.3d at 948 n.4; see also Abramski v. United States, 573 U.S. 169, 179 (2014) (explaining that courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose'") (citation omitted).

Section 1225(b)(4) further underscores the above analysis. That subsection provides "[t]he decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer" and referred to "an immigration judge" for a removal proceeding under § 1229a. 8 U.S.C. § 1225(b)(4). But ICE officers conducting enforcement and removal operations in the interior of the country cannot make a binding decision that is favorable to the admission of an apprehended noncitizen. To suggest otherwise would mean that an ICE officer has the authority to confer an "admission," and all the legal benefits that arise

from an admission, on a noncitizen in the interior who is present without admission or parole. But when ICE officers apprehend noncitizens like Class Members, they *charge* them with being inadmissible and thereby commence removal proceedings *before an immigration judge*. It is the immigration court, not the arresting ICE officers, that makes a "decision" that is either favorable or unfavorable regarding a noncitizen's admissibility. This further clarifies that "inspection" by an "examining immigration officer" as contemplated in § 1225(b)(2)(A) refers to a process that occurs only at the border.[15]

### ii.    Class Members are not 'Seeking Admission' Under § 1225(b)(2)(A)

That § 1225(b)(2)(A) only applies in the border context, and cannot apply to Class Members, is also evident in Congress' use of the phrase "seeking admission," a phrase which was similarly preserved from the predecessor statutory provision. See 8 U.S.C. § 1225(a) (1995). To reiterate, Class Members are noncitizens without lawful status, who are charged with being present without inspection or parole, and thus inadmissible. See 8 U.S.C. § 1182(6)(A). Again, admission is statutorily defined as "lawful entry into the United States." 8 U.S.C. § 1101(a)(12)(A). Seeking, however, is not defined, and while "Congress may . . . define a word or phrase [like 'admission' and 'applicant for admission'] in a specialized way," "absent such [a definition], those whose lives are governed by the law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages." Feliciano v. Dep't of Transp., 605 U.S. 38, 45 (2025). The ordinary meaning of "seeking" in this context means "to go in search of" "to move or act so as to reach or arrive at" "to ask for" or "to try to acquire or gain." Seek, Merriam-Webster's Unabridged Dictionary, MERRIAM-WEBSTER [https://perma.cc/R8D8-CBTT] (last visited Mar. 30, 2026).

It simply defies common usage to state that Class Members, who are arrested while *already*

---

[15] Congress also specifically indicated that § 1225, as amended by IIRIRA, continues to govern "arrival and inspection" at the border while § 1226 governs after unlawful entry "through proceedings and removal." See H.R. Rep 104-469, pt. 1, at 13 (1996). Specifically, Congress explained the IIRIRA amendments were intended to "reorganize[]" the provisions of the INA "to provide a more logical progression from arrival and inspection through proceedings and removal." Id. This strongly suggests that Congress used the term "inspection" throughout the INA, and in § 1225, as it had been historically used, to refer to a process that occurs upon "arrival," while subsequent provisions, such as § 1226, govern within the country, after entry. Id.

*inside* the U.S, and not while arriving in the country, are trying to acquire or gain "lawful entry," where entry means "'coming from outside' into the United States." Torres, 976 F.3d at 924 (citation omitted). Thus, the government's contention that the ordinary meaning of "seeking admission" encompasses Class Members does not pass muster. See Defs.' Opp'n 13–14, ECF No. 87. As Justice Scalia wrote, "the acid test of whether a word can reasonably bear a particular meaning is whether you could use the word in that sense at a cocktail party without having people look at you funny." Johnson v. United States, 529 U.S. 694, 718 (2000) (Scalia, J., dissenting). The government's "assigned meaning would surely fail that test, even late in the evening." Id. One cannot come from outside *into* the country when they are already present within it and have been for years, or as one district court succinctly put it, "you can't go into a place where you already are." J.G.O. v. Francis, 25-CV-7233 (AS), 2025 WL 3040142, at *3 (S.D.N.Y. Oct. 28, 2025); see also Kyong Ho Shin v. Holder, 607 F.3d 1213, 1220 (9th Cir. 2010) (counseling that courts must use common sense in construing the INA).

Adopting the reasoning of the Fifth Circuit majority, the government contends "every 'applicant for admission' is inherently and necessarily 'seeking admission.'" Defs.' Opp'n 13, ECF No. 87. The Fifth Circuit reasoned that "seeking" is like "applying" and an applicant for admission is therefore necessarily seeking admission, with an analogy to applying to college and thereby seeking admission. Buenrostro-Mendez, 166 F.4th at 502 (Using the example of a college applicant, stating "[i]t would make no sense to say that as soon as the applicant clicks 'submit' on her application, she is no longer seeking admission, merely because she does not take any further affirmative steps to gain admittance."); accord Avila, 2026 WL 819258, at *3. But that distorts the specially defined term of art that Congress created in "applicant for admission" through § 1225(a)(1). "[T]hough in the usual sense an 'applicant' usually has sought permission for something" imposing an ordinary meaning of "applicant" in this context, "would break apart the term of art—'applicant for admission'—that has been plainly defined by the statute and gloss the singular word 'applicant' with a meaning that Congress expressly never intended." de Jesus Aguilar v. English, 3:25-CV-898 DRL-SJF, 2025 WL 3280219, at *7 (N.D. Ind. Nov. 25, 2025) (citing Digital Realty Tr., Inc. v. Somers, 583 U.S. 149, 160 (2018) ("When a statute includes an

explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning.") (quotations altered and citation omitted)). "So 'applicant for admission' means, and only means, what Congress says it means." Id.

Indeed, the Ninth Circuit specifically overruled its prior decision in Minto v. Sessions, 854 F.3d 619 (9th Cir. 2017) for misreading the "deeming provision" in § 1225(a)(1), "which places some physically-but-not-lawfully present noncitizens into a fictive legal status for purposes of removal proceedings" as equivalent to "application for admission" as that phrased is used in § 1182(a)(7). Torres, 976 F.3d at 927–29. Specifically, the Court held that "application for admission" under § 1182(a)(7) refers to "a real event": "the moment in time when the immigrant actually applies for admission *into* the United States." Id. at 929 (citing 8 U.S.C. § 1182(a)(7)) (emphasis added). The Ninth Circuit also pointed to a BIA decision which accurately distinguished between the term "'applicant for admission' in the deeming provision of § 1225(a)(1)" as "'merely' determine[ing] a [noncitizen's] legal status for purposes of removal proceedings" and "otherwise 'distinguishable from "applying . . . for admission to the United States" within the meaning of' § 1182(h)." Id. at 929 (quoting Matter of Y-N-P-, 26 I. & N. Dec. 10 (BIA 2012)).

Interpreting "applicant for admission" according to ordinary meaning, rather than as a term of art, as the government does, would suggest that since a noncitizen present in the U.S. without admission remains an "applicant for admission" under § 1225(a)(1), they are likewise perpetually submitting an "application for admission" under 8 U.S.C. §§ 1182(a)(7) and 1182(h). But the Ninth Circuit specifically rejected a reading that conflates the term of art "applicant for admission" with the term "application" as it is used elsewhere in the INA, and held "the time of *application* for admission is the time when a noncitizen seeks permission to physically enter United States territory."[16] Torres, 976 F.3d at 924 (emphasis added). It is thus equally erroneous to state that a

[16] In fact, consistent with their new policies, Defendants charge Class Members with inadmissibility under § 1182(a)(7), in addition to § 1182(a)(6), even though the application of § 1182(a)(7) to Plaintiffs is foreclosed by the Ninth Circuit's decision in Torres. See, e.g., Pls.' Mot. to Certify Class, Ex. 2C, ECF No. 15-5 (October 3, 2025 Order of Immigration Judge noting Named Plaintiff Jacobo-Ramirez is charged by DHS as inadmissible under §§ 1182(a)(6)(A)(i) *and* (a)(7)(A)(i)(I)); see also Avila, No. 25-3248, 2026 WL 819258, at *1 (DHS "initiated removal

noncitizen who occupies the "fictive legal status for purposes of removal proceedings" of "applicant for admission" is perpetually *applying for* (*i.e.* seeking) admission when they long ago entered the country *without admission*. Id. at 928.

Further, the government and Fifth Circuit's reading of "an alien seeking admission" as synonymous to "an applicant for admission" would render Congress' use of the phrase "seeking admission" superfluous, and thereby violate fundamental canons of construction. See Pulsifer v. U.S., 601 U.S. 124, 149 (2024) ("In a given statute . . . different terms usually have different meanings.") (citing A. Scalia & B. Garner, Reading Law 170-71 (2012) (explaining the meaningful-variation canon)); see also Microsoft Corp. v. l4l Ltd. Partn., 564 U.S. 91, 106 (2011) (The canon against surplusage applies to give effect "to every clause and word of a statute.") If Congress intended all noncitizens already present in the U.S. without inspection to be subject to § 1225(b)(2)(A), as the government contends, that provision could read: "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that ~~an alien seeking admission~~ [the alien] is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."[17] See Biden v. Texas, 597 U.S. at 798 ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."). Instead, Congress limited the subsection's mandatory detention requirement to apply only to a noncitizen who is both an applicant for admission and *is also* a noncitizen "seeking admission." 8 U.S.C § 1225(b)(2)(A).

The government responds that "seeking admission" does not have independent meaning in

---

proceedings against [Avila] . . . charging him with removability under 8 U.S.C. §§ 1182(a)(6)(A)(I), (a)(7)(A)(i)(I) for being an alien present in the United States without being admitted and lacking valid entry documentation.").

[17] As Plaintiffs' point out, in its brief, the government quotes § 1225(b)(2)(A), but substitutes the word "the" for the word "an" before the term "alien seeking admission" in an effort to equate the phrase "*an* alien seeking admission" with the preceding reference to "*an* applicant for admission." Pls.' Reply 8 n.1, ECF No. 88 (citing Defs.' Opp'n at 13, line 17, ECF No 87). By rewriting § 1225(b)(2)(A) in this manner, the government seems to recognize that the statutory text as written does "not create the equivalency it is looking for." Id. (citing United States Sugar Corp. v. E.P.A., 113 F.4th 984, 993 (D.C. Cir. 2024) ("Congress's choice between a definite and indefinite article matters when determining statutory meaning.") (citing Corner Post, Inc. v. Bd. Of Governors of Fed. Rsrv. Sys., 604 U.S. 799, 817 (2024)).

§ 1225(b)(2)(A) because "[r]redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." Defs.' Opp'n 15, ECF No. 87 (quoting Barton v. Barr, 590 U.S. 222, 223 (2020)). However, as the Supreme Court held in Rimini St., Inc v. Oracle USA, Inc., 586 U.S. 334 (2019), the case Barton cited in support of its reasoning, "[i]f one possible interpretation of a statute would cause some redundancy and another interpretation would avoid redundancy, that difference in the two interpretations can supply a clue as to the better interpretation of a statute." Id. at 346. And in Barton, both parties agreed that their competing interpretations would render at least some separate statutory provisions superfluous. See Barton, 590 U.S. at 239; see also Rimini, 586 U.S. at 345 (explaining the party invoking the surplusage canon was hypocritically presenting an interpretation that "would create its own redundancy problem" by rendering a portion of a separate provision "largely redundant."). In contrast, Plaintiffs' proposed interpretation creates no surplusage. Therefore, interpreting Congress' use of the phrase "seeking admission" in § 1225(b)(2)(A) to do the independent work of limiting the mandatory detention provision's application to all "applicants for admission" is clearly the superior interpretation. See Corrales-Vazquez, 931 F.3d at 950 (rejecting the government's interpretation of the INA as violating "the cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute") (citing Loughrin v. United States, 573 U.S. 351, 358 (2014) (internal quotation marks omitted).

Additionally, as discussed below, construing the phrase "seeking admission" as limiting § 1225(b)(2)(A)'s application to the border context allows for a consistent interpretation of that identical phrase as it is used in a separate provision of the INA, 8 U.S.C. § 1357(c). See discussion infra **Section VI.C.3.ii**.

The Court further rejects the government's reliance on the neighboring provision in § 1225(a)(3) to demonstrate that "applicant[s] for admission" are a subset of noncitizens "seeking admission." See Defs' Opp'n 13–14, ECF No. 87. That provision requires the inspection of "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." 8 U.S.C. § 1225(a)(3). The government states "the word

- 33 -

'otherwise' means in a 'different way or manner.'" Defs.' Opp'n 13, ECF No. 87 (citing Texas Dep't of Hous. & Cmty. Affs. V. Inclusive Communities Project, Inc., 576 U.S. 519, 535 (2015) (quoting Webster's Third International Dictionary 1598 (1971)). However, that meaning does not necessarily support the government's interpretation that "'[b]eing an applicant for admission' is thus a particular 'way or manner' of 'seeking admission,' such that an alien who is an "applicant for admission" *is* "seeking admission for purposes of § 1225(b)(2)(A)." Id. at 14.

The dictionary definition of the phrase "or otherwise," is "used to refer to something that is *different* from something already mentioned." Or Otherwise, Merriam-Webster's Collegiate Dictionary, MERRIAM-WEBSTER [https://perma.cc/5S5M-L3HY] (last visited Mar. 30, 2026) (emphasis added). This is consistent with the ordinary meaning of "or," a term that is "almost always disjunctive, that is, the words it connects are to be given separate meanings." Loughrin v. United States, 573 U.S. 351, 357 (2014) (citation omitted). The government's insistence that "seeking admission" is necessarily a subset of "applicant for admission" is not consistent with the ordinary meaning of "or otherwise." Further, the case law the government cites for its interpretation of "or otherwise" as creating a category-subset relationship is based on statutory phrases where "otherwise" connects multiple verbs.[18] See Villarreal v. R.J. Reynolds Tobacco Co., 839 F.3d 958, 963–64 (11th Cir. 2016) (*en banc*) (analyzing "otherwise" that connected two

---

[18] Meanwhile other statutes use "or otherwise" without signaling a category-subset relationship. See, e.g., 22 U.S.C. § 7103(d)(7)(C) (requiring report of "the number of persons who have applied for, been granted, or been denied a visa or otherwise provided status under [other provisions]"); 38 U.S.C. § 8102(b) ("No medical facility may be constructed or otherwise acquired or altered except [under specified circumstances].").

In fact, § 1226(a)(3) uses "or otherwise" to distinguish two categories without suggesting one is a subset of the other. That provision allows the Secretary to release a noncitizen and provide work authorization if the noncitizen "is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization." 8 U.S.C. § 1226(a)(3). Lawful permanent residents do not require work authorization, as they are automatically work-eligible. See 8 U.S.C. § 1324a(h)(3) (a noncitizen "lawfully admitted for permanent residence" is work-eligible and does not need to be "authorized to be . . . employed."). Thus, the two categories in § 1226(a)(3) (lawful permanent residents and other individuals who would be eligible for work authorization) do not form a category-subset relationship and demonstrate that the government and Fifth Circuit majority's characterization of the ordinary meaning of "or otherwise" is misplaced.

verbs); see also Kleber v. CareFusion Corp., 914 F.3d 480, 483 (7th Cir. 2019) (same). But "Section 1225(a)(3)'s list reflects a mix of parts of speech: the noun 'applicants for admission' alongside the adjectival present participle 'seeking' and participial phrase 'seeking admission or readmission.'" Buenrostro-Mendez, 166 F.4th at 518 (Douglas, J., dissenting).

> Thus, the subsection Congress actually wrote is more like saying, at the end of football season, "All students who are football players or otherwise seeking to play football or cheerlead should come to the gym for an info session this evening." In a grammatical void, we might be tempted to equate "football players" with "students seeking to play football," or deem the former a subset of the latter, but the players on the actual football team (the high school equivalent of a statutory term of art) would likely disagree.

Id. In any event, reading "or otherwise" according to its ordinary meaning, i.e., referring to "seeking admission" as meaning something different from "applicant for admission," recognizes that "Congress chose to include this additional phrase—'seeking admission'—not once but . . . multiple times [which] suggests that it must mean something distinct." J.G.O., 2025 WL 3040142, at *3.

The government alternatively argues that Class Members are presently engaged in the act of "seeking admission" when, after being arrested and detained for removal proceedings, they decide not to depart from the country pursuant to 8 U.S.C. § 1225(a)(4). Defs.' Opp'n 16–17, ECF No. 87. But the government's reference to that provision only further emphasizes the inapplicability of § 1225 to Class Members. Section 1225(a)(4) codified a longstanding mechanism for noncitizens who have not yet entered the country to withdraw an application for admission and depart immediately to avoid the entry of a removal order. See 62 Fed. Reg. at 10313. This statutory withdrawal is not available to Class Members, because they already entered the U.S. without inspection and are not "arriving aliens." See, e.g., 8 C.F.R. § 1240.1(d) ("An immigration judge may allow only an arriving alien to withdraw an application for admission.") Instead, Class Members have access to a distinct form of discretionary relief to avoid removal proceedings and other statutory penalties: voluntary departure. See 8 U.S.C. § 1229c; Dada v. Mukasey, 554 U.S. 1, 8-13 (2008). Notably, the government provides no mechanism for Class Members to rely on § 1225(a)(4)'s withdrawal relief.

Similarly, the government suggests that Class Members like Named Plaintiff Guevara-

Alcantar who apply for relief from removal while living in the U.S. are "seeking admission" pursuant to § 1225(b)(2)(A) because they are engaged in an affirmative act to obtain lawful status. Defs.' Opp'n 16–17, ECF No. 87. The government points to Mr. Guevara-Alcantar's U-Visa application to support this argument, but its own recently issued policy guidance clarifies that a grant of a U-Visa is not an "admission." See U.S. Citizenship & Immigr. Servs., Policy Alert, Admission for Adjustment of Status under INA 254(a), PA-2025-25 (Nov. 3, 2025). Similarly, the Supreme Court has clarified that a noncitizen inside the country, who entered without inspection, who applies for relief from removal is "seeking lawful status," not "seeking admission" which could confer lawful permanent residence See Sanchez v. Mayorkas, 693 U.S. 409, 414 (2021); see also Guerro Orellana v. Moniz, No. 25-CV-12664-PBS, 2025 WL 2809996, at *7 (D. Mass. Oct. 3, 2025) ("A grant of cancellation of removal would result in [the plaintiff's] adjustment of status . . . while he remains in the United States, not his lawful entry into the country."). In sum, the Court finds that § 1225(b)(2)(A) does not apply to Class Members because they are not "seeking admission" as contemplated in that provision.

### iii.   Section 1226 Applies to Class Members

Even if the Court had doubts that the text of § 1225, without more, is sufficient to resolve the mandatory detention provision's inapplicability to Class Members, the text of § 1226 resolves those doubts. That section, titled "[a]pprehension and detention of aliens" allows DHS "on a warrant" to arrest, detain, and release any noncitizen "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The term "apprehension" in § 1226, as compared to "inspection" by "examining immigration officer[s]" in § 1225(b)(2)(A), far more accurately describes what ICE Enforcement and Removal officers are doing when they encounter Class Members in the interior. See Apprehension, Merriam-Webster's Unabridged Dictionary, MERRIAM-WEBSTER [https://perma.cc/26QN-GR6N] (last visited Mar. 30, 2026) ("the taking by legal, especially criminal, process: arrest"). The government has not argued that the plain text of § 1226(a) is inapplicable to Class Members, nor can it. Instead, it asserts § 1225(b)(2)(A) supersedes § 1226(a): as explained by the BIA in Hurtado, the government's new reading asserts that because § 1226 "does not purport to overrule the mandatory detention requirements for

arriving aliens and applicants for admission explicitly set forth" in § 1225(b), any noncitizen who entered the country without inspection "shall be detained" under § 1225(b)(2) during the pendency of removal proceedings. Hurtado, 29 I. & N. at 218–19 (quoting § 1225(b)(2)).

Importantly, the text of § 1226(c) *mandates* detention for certain noncitizens charged as "deportable" (meaning they were previously lawfully admitted to the United States) or "inadmissible" under, *inter alia*, 8 U.S.C. §§ 1182(a)(6)(A), (6)(C), or (7) (meaning they have not been admitted to the United States). See 8 U.S.C. §§ 1226(c)(1)(A)–(E). Most relevant here, § 1226(c) requires detention of a noncitizen who is deemed inadmissible because they are "present in the United States without being admitted or paroled" under § 1182(a)(6)(A) and is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements" of certain crimes. 8 U.S.C. §§ 1226(c)(1)(E)(i)–(ii). A plain reading of the exceptions under § 1226(c), and, most importantly, the fact that such "exceptions" to the availability of being released on bond *exist*, supports a finding that § 1226(a) applies to all noncitizens who, like Class Members, are charged as being "present in the United States without being admitted or paroled" under § 1182(a)(6)(A) but who have not been implicated in any of the enumerated crimes set forth in § 1226(c). See Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co., 559 U.S. 393, 400 (2010) (finding that where Congress creates "specific exceptions" to a statute's general applicability, it "proves" that absent those exceptions, the statute generally applies). Indeed, if Congress had intended § 1225(b)(2)(A) to apply to all noncitizens who had not been admitted, regardless of whether they were detained at the border, there would have been no need to again specify mandatory detention for certain categories of inadmissible noncitizens (but not others) under § 1226(c). Id.; see also Nielsen, 586 U.S. at 409 (interpreting § 1226(a) and holding "subsection (c) is simply a limit on the authority conferred by subsection (a).")

The government responds that these provisions are not rendered entirely useless because they apply in the case of noncitizens who "are inadmissible but were erroneously admitted." See Defs.' Resp. to Pls.' Compl. 15, ECF No. 39. But that describes a relatively small category of noncitizens, compared to the millions who are present without admission, and the fact that the government's reading "would in practical effect render [§ 1226(c)(1)(E)] entirely superfluous in

all but the most unusual circumstances" cannot cure a surplusage problem. TRW Inc. v. Andrews, 534 U.S. 19, 29 (2001). Moreover, the fact that the Laken Riley Act added § 1226(c)(1)(E), which mandates detention for certain noncitizens inadmissible under § 1182(a)(6)(A), further emphasizes the importance of interpreting § 1225(b)(2)(A) to avoid rendering § 1226(c)(1)(E) superfluous. Shulman v. Kaplan, 58 F.4th 404, 410–11 (9th Cir. 2023) ("a court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation and quotation marks omitted); Gieg v. Howarth, 244 F.3d 775, 776 (9th Cir. 2001) ("When Congress acts to amend a statute, [courts] presume it intends its amendments to have real and substantial effect.").

The government, the BIA in Hurtado, and the Fifth and Eighth Circuit minimize the disharmony created by their interpretation of § 1225(b)(2)(A) and § 1226(c) as another redundancy to be interpreted as "a congressional effort to be doubly sure" see Hurtado, 29 I. & N. at 222 (quoting Barton, 590 U.S. 239). But this reading needlessly takes a "sledgehammer to the statutes Congress wrote, including laws it passed just a year ago." Buenrostro-Mendez, 554 U.S. at 512 (Douglas, J., dissenting). A harmonious reading *must* prevail over a reading that would create redundancy between §§ 1225 and 1226, because "the Court does not lightly assume Congress adopts two separate clauses in the same law to perform the same work," and there is no evidence that Congress did so in enacting § 1226(c)(1)(E). United States v. Taylor, 596 U.S. 845, 847 (2022); see also Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013) ("the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Relatedly, "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,' the Court generally presumes the new provision should be understood to work in harmony with what has come before." Monsalvo v. Bondi, 604 U.S. 712, 725 (2025) (quoting Haig v. Agee, 453 U.S. 280, 297–98 (1981)). For decades, succeeding administrations have applied § 1225 only to individuals who presented themselves at a United States border or who were arrested while attempting to enter the country other than at a port of

arrival. They applied § 1226 to individuals arrested after having entered the country without detection and who had lived in the country for some period. Congress enacted the Laken Riley Act in this historical context. Had the generally understood meaning of § 1225 been what the government now claims, Congress would have had no need to add § 1226(c)(1)(E).

The Fifth Circuit responds that Congress passed the Laken Riley Act "at a time when the Executive was still declining to exercise its full enforcement authority under the INA. Accordingly, the Act did have a substantial effect when passed insofar as it required the detention without bond or parole of certain aliens the administration was then treating as bond-eligible." Buenrostro-Mendez, 554 U.S. at 505. But that does not explain why Congress effectively ratified the existing agency practice by amending § 1226 rather than amending § 1225 to clarify that Congress had always intended all noncitizens who entered without inspection to be subject to mandatory detention. To the extent that the Executive has been violating the law for the past thirty years, as the government claims, it is reasonable to assume that Congress "would have made it plain" through the Laken Riley Act amendments. Torres, 976 F.3d at 928.

### iv. Defendants Create Unnecessary Conflict Between §§ 1225 and 1226

Finally, the government's interpretation of the statute does not simply render § 1226(c) duplicative or superfluous—it creates significant tension between the statutory provisions and the differences in the discretionary detention authority each provision delegates. To illustrate, § 1225(b)(2) and § 1226(c) mandate different categories of detention with different requirements. An applicant detained under § 1225(b)(2) may only be released under the parole provisions of § 1182(d)(5) "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). While the Secretary's discretion to grant release under § 1182(d)(5) is more limited than under § 1226(a), noncitizens granted § 1182(d)(5) parole from custody under § 1225(b)(2) are also granted more rights, including the ability to apply for work authorization and adjustment of status. In contrast, § 1226(a) specifically forbids the Secretary from providing a noncitizen released on conditional parole (other than legal permanent residents) with a work authorization. Id. § 1226(a)(3). And noncitizens released on conditional parole under § 1226(a) are not eligible for adjustment of status. Accordingly, the various grants of authority

under which the Secretary may detain a noncitizen under §§ 1225 and 1226 are not simply redundant—they impose entirely different detention schemes.

The government anticipated the inconsistency created by its new interpretation of the statutory scheme as evidenced in the July 8th Memo. It insists "DHS does not take the position that prior releases of applicants for admission pursuant to [§ 1226(a)] were releases on parole under [§ 1182(d)(5)(A)]." See Pls.' Mot., Ex. A at 3, ECF No. 74-1. Complications from this inconsistent position have already arisen in the Eleventh Circuit. On December 12, 2025, that court heard oral argument in Labrada-Hechavarria v. U.S. Attorney General, a case that concerns whether Cuban nationals who were denied adjustment to lawful permanent resident status because they were previously released on conditional parole under § 1226(a), should nevertheless be granted the benefits of humanitarian or public benefit parole under § 1182(d)(5)(A) (such as eligibility for adjustment of status) given the government's assertion that, as a matter of law, their detention should have occurred under § 1225(b)(2). During argument, the court noted that the situation created by the government's changed policy was a "mess" and stated: "You can't have your cake and split it up in two ways so that you get the good side of it and not the bad side of it. You can't get the mandatory detention that the administration wants for almost all aliens and deny a class of aliens that you [released under a different section of the INA] the benefits of that severe scheme." Oral Argument at 18:01, 19:21, Labrada-Hechavarria v. U.S. Att'y Gen., No. 23-13664 & 24-10645 (11th Cir. Dec. 12, 2025).

The Eleventh Circuit has since vacated and remanded the BIA's decisions which held that noncitizens previously detained and released under § 1226(a) are ineligible for adjustment of status, due to the government's changed legal position and the BIA's decision in Hurtado. Labrada-Hechavarria v. U.S. Attorney General, 23-13664, 2026 WL 496486 (11th Cir. Feb. 23, 2026). This portends a conflict that upends the delicate statutory structure of the INA, which the judiciary must avoid where a harmonious interpretation is not just possible, but far more plausible. See Epic Sys. Corp. v. Lewis, 584 U.S. 497, 511 (2018) ("Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them.").

For all these reasons, the court finds that § 1225 applies to inspections at the border, whereas § 1226 applies to noncitizens living in the country. While the provisions of § 1226(a) clearly apply to Class Members, there is substantial doubt about whether the provisions of § 1225(b)(2) also apply. The government has therefore failed to show that the mandatory detention requirement of § 1225(b)(2)(A) must supersede the discretionary detention requirement of § 1226(a)—and, as a result, the Court finds that the government's policies refusing to provide Class Members the procedural protections they are entitled to under § 1226(a) are unlawful under the INA and its implementing regulations.

### 2. Legislative History and Purpose

Although the Court finds the above discussion resolves the statutory question, the Court turns to the legislative history and purpose of the INA as amended by IIRIRA, because the government frames its interpretation of § 1225(b)(2)(A) as necessary to preserve Congress' legislative purpose. First, the Court notes that while legislative history is an "additional tool of analysis," "only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language." Garcia v. U.S., 469 U.S. 70, 75 (1984). As Judge Douglas described, and the Court agrees, "[s]tarting from a purpose-centered reading of the wrong statutory provision [§ 1225(a)(1)], the [government] produces textualism without text." Buenrostro-Mendez, 166 F.4th at 520 (Douglas, J., dissenting). As illustrated below, the government's characterization of legislative purpose based on statements regarding the enactment of § 1225(a) does not rise to an "extraordinary showing of contrary intentions" sufficient to justify distorting § 1225(b)(2)(A). Garcia, 469 U.S. at 75. To the contrary, the legislative history further supports the above harmonious reading of §§ 1225 and 1226 and the many flaws in the government's new interpretation of § 1225(b)(2)(A).

One purpose of the IIRIRA amendments was to equalize the treatment in enforcement proceedings of noncitizens presenting themselves for inspection at ports of entry, and those apprehended in the interior after effecting an unlawful entry. See Hing Sum v. Holder, 602 F.3d 1092, 1099 (9th Cir. 2010). "Prior to 1996, the INA primarily distinguished individuals on the basis of 'entry' and not 'admission.'" Id. "Entry" included entry without inspection, and "[n]on-

- 41 -

citizens who had effected an 'entry' into the United States were subject to deportation proceedings, while those who had not made an 'entry' were subject to exclusion proceedings." Id. Prior to IIRIRA, "non-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." Id. "IIRIRA addressed this anomaly by substituting 'admission' for 'entry' and by replacing deportation and exclusion proceedings with a general 'removal' proceeding." Id. IIRIRA also "added § 1225(a)(1) to ensure that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings under the INA—in the position of an 'applicant for admission.'" Torres, 976 F.3d at 928.

The government maintains, as the Fifth Circuit majority found, that an interpretation of the INA that subjects Class Members to the detention framework of § 1226(a) undoes the fix created by Congress by granting them a privilege not available if they had presented themselves for inspection at a port of entry. See Defs.' Opp'n 4–6. This argument misunderstands both the nature of the distinction between §§ 1225 and 1226, as well as the extent of the fix that IIRIRA provided. First, it assumes that it is always better to be subject to the discretionary detention provisions of § 1226(a) rather than the mandatory detention provisions of § 1225(b). But as discussed above, a noncitizen detained under § 1225 may apply for humanitarian or significant public benefit parole under § 1182(d)(5). A grant of parole under § 1182(d)(5) provides a parolee with greater substantive rights, including work authorization, see 8 C.F.R. § 274a.12(c)(11), a tolling of unlawful presence time, see 8 U.S.C. § 1182(a)(9)(B)(ii), and eligibility for Social Security benefits, see 20 C.F.R. § 416.1618(a), (b)(2). See Carbajal v. Wimmer, 2:26-CV-00093, 2026 WL 353510, at *2 (D. Utah Feb. 9, 2026). In contrast, noncitizens granted conditional parole under § 1226(a) are not eligible for these benefits. Id. The government's revised position, and the Fifth Circuit and Eighth Circuit's opinions upholding that position (i.e., that § 1225(b)(2) is the controlling detention provision for noncitizens in the interior of the country who entered without inspection) would grant eligibility for humanitarian or public benefit parole under § 1182(d)(5)(A)

- 42 -

to a large class of noncitizens to whom the benefits of that parole were previously unavailable. Id.

Because the government does not address the INA's provisions concerning parole, the Fifth Circuit presumed detention under § 1226(a) is necessarily preferable to detention under § 1225(b)(2). Buenrostro-Mendez, 166 F.4th at 508 n.15 (referring to discretionary detention as "one of the most significant advantages available for unlawful entrants"). And because the majority notes that a "predominant goal" in the enactment of IIRIRA was "to reduce the disparity between lawful and unlawful applicants for admission[,]" the majority found that Congress *must have* intended that all applicants for admission who cannot establish admissibility beyond doubt be detained without the possibility of release on bond. Id. But for the reasons stated above, the detention schemes under § 1225 and § 1226 are distinct, with different advantages and disadvantages. The failure to account for that distinction illustrates the importance of courts relying upon ordinary tools of statutory interpretation, rather than overlooking them based on a speculative determination of what "better honors [the] predominant goal in the enactment of IIRIRA." Id.; see Luna Perez v. Sturgis Public Schs., 598 U.S. 142, 150 (2023) ("[N]o law pursues its purposes at all costs."); Rodriguez v. United States, 480 U.S. 522, 526 (1987) ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.")

Moreover, IIRIRA *did* place noncitizens charged with inadmissibility, whether at a port of entry or within the country, on equal footing concerning the procedures and the burden of proof in removal proceedings—but removal proceedings are distinct from custody determination proceedings. See 8 C.F.R. § 1003.19(d) (noting that an Immigration Judge's consideration of requests for "custody or bond … shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding"). "Now, *in removal proceedings*, the relevant distinction for procedural purposes is whether the immigrant has been lawfully admitted, regardless of actual physical presence." Torres, 976 F.3d at 928 (emphasis added). Specifically, the framework enacted by IIRIRA requires that an applicant for admission, regardless of physical presence, must prove either "clearly and beyond doubt" that they are entitled to be admitted or,

"by clear and convincing evidence," that they are lawfully present in the United States due to a prior admission. 8 U.S.C. § 1229a(c)(2). In contrast, in the case of a noncitizen who has been lawfully admitted but is charged with deportability, it is DHS who has the burden of establishing "by clear and convincing evidence" that the noncitizen is deportable. Id. § 1229a(c)(3).

But nothing in the legislative history supports an assumption that Congress's stated concern about procedural and substantive discrepancies *in removal proceedings* would also extend to *custody* determinations. See H.R. Rep. 104-469, pt. 1, at 225 (1996) (explaining § 1225(a)(1) "[wa]s intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges *in immigration proceedings* that are not available to aliens who present themselves for inspection at a port of entry") (emphasis added). Further, even with regards to removal proceedings as opposed to custody determinations, Congress explicitly reflected its understanding of longstanding due process precedent that recognizes the more substantial due process rights of noncitizens already present and residing in the U.S. compared to the minimal rights of noncitizens seeking to enter. See id. at 163–66 (recognizing the "constitutional liberty interest to remain in the U.S." held by noncitizens "present in the U.S." versus the lack of a liberty interest in entering the U.S. held by "aliens seeking admission," *i.e.*, "initial entrants," *i.e.*, "applicant[s] for initial entry") (first quoting Landon v. Plasencia, 459 U.S. 21, 32 (1982), then quoting Knauff v. Shaughnessy, 338 U.S. 537 (1950)). Nothing in the legislative history indicates Congress sought to legislate away this bedrock constitutional principal underlying immigration law.

Moreover, there are good reasons why Congress would provide for mandatory detention at the border but discretionary detention within the country. As another district court explained:

> [N]oncitizens who have lived for years in this country are more likely to be working in critical industries, parenting U.S. citizen children, or otherwise serving their communities. The mass detention of these individuals—without regard to flight risk or danger to the public—is far more disruptive to local American economies, families, and communities than the detention of noncitizens who have just crossed the border.

Rodriguez v. Bostock, No. 3:25-cv-5240-TMC, 2025 WL 2782499, at *24 (W.D. Wash. Sept. 30, 2025) (citation modified).

- 44 -

In fact, in passing IIRIRA, Congress was acutely concerned about the strain on detention capacity that § 1226(c) would impose by mandating detention of an estimated 45,000 noncitizens subject to removal on criminal grounds each year. See H.R. Rep. No. 104-469, pt. 1 at 118, 120, 123. To address that concern, Congress authorized the Executive to defer implementation of § 1226(c) for two years while the agency built up detention capacity, which was promptly invoked. IIRIRA, § 303(b), 110 Stat. 3009-586 to 3009-587; Doris Meissner, Comm'r, INS to Henry J. Hyde Chariman, Comm. On the Judiciary, U.S. House of Representatives, Letter Invoking IIRIRA Transitional Period Custody Rules (Oct. 3, 1997). It is therefore reasonable to assume that if Congress intended to mandate the detention of what was at the time estimated to be two million people living in the U.S., as the government insists, there would be some reference to the practical realities that mass detention at such an unprecedented scale would pose.[19] See Whitman v. Trucking Associations, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not one might say, hide elephants in mouseholes.")

Further, there is ample evidence in the Congressional record that favors Plaintiffs' position. Most significantly, noncitizens present in the United States like Class Members, would have been subject to deportation proceedings before the enactment of IIRIRA. See Hose v. I.N.S., 180 F.3d 992, 994 (9th Cir. 1999) ("A deportation hearing was the usual means of proceeding against an alien already physically in the United States[.]") (citation modified). And the predecessor statute to § 1226(a) also provided for discretionary release on bond for these individuals. See 8 U.S.C. § 1252(a)(1) (1995) ("[A]ny such alien taken into custody may, in the discretion of the Attorney General … be continued in custody … [or] be released under bond[.]").  When passing IIRIRA, Congress specifically indicated: "Section [1226(a)] restates the current provisions in section [1252(a)] regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States."  H.R. Rep. No. 104-469, pt. 1 at 229.

Notably, Congress also referred to § 1225(b)(2) as a provision that applied to the

---

[19] The estimated population of noncitizens in the U.S. who entered without inspection as about two million in 1996. See H.R. Rep. 104-469, pt. 1 at 111.

"[i]nspection of other arriving aliens." Id. And the term "arriving alien" employed at several points throughout the IIRIRA amendments was intended to distinguish "aliens at the border of the United States from those who have made a substantial physical entry into the United States." See Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary, 105th Cong. 17–18 (1997) at 99 (Statement by Representative Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims). And with regards to detention under § 1225(b)(2), it was explicitly noted that Congress was referring to "custody of aliens applying at land borders" in enacting that section. Id. at 101.

The Court therefore finds that the legislative history supports the Court's interpretation of §§ 1225 and 1226, and the government's characterization of Congress' legislative purpose in enacting IIRIRA as mandating the detention of millions of people is unsupported by the legislative record.

### 3. Constitutional Avoidance

The government's new reading of § 1225(b)(2) also runs afoul of the presumption that Congress enacted a constitutional statute. As discussed below the government has proffered "an interpretation of a federal statute that engenders constitutional issues" even though a more "reasonable alternative interpretation" does not raise such constitutional concerns. See Gomez v. U.S., 490 U.S. 858, 858 (1989).

#### i. Due Process

Consistent with this Court's finding that Named Plaintiffs are likely to succeed on their due process claims, see Order Granting Preliminary Injunction 12–18, ECF No. 35, by subjecting Class Members to mandatory detention without meaningful procedural protections to ensure it has a constitutionally legitimate interest in detaining them, the government's policies are based on a statutory interpretation that raises serious doubts under the Due Process Clause. Zadvydas v. Davis, 533 U.S. 678, 689-90 (2001) ("[I]t is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises 'a serious doubt' as to its constitutionality," courts will "first ascertain whether a construction of the statute is fairly possible by which the question may be

avoided."). Specifically, by collapsing the distinction between noncitizens "who have established connections in this country" and their greater due process rights as compared to a noncitizen "at the threshold of initial entry," the government needlessly interprets § 1225(b)(2)(A) in a manner that would render it unconstitutional. Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 107, (2020) (finding a noncitizen who was apprehended "just 25 yards from the border" in the process of trying to enter the country illegally was "at the threshold of initial entry" and thus subject to lesser due process rights in removal proceedings than "aliens who have established connections in this country").

If the Court were to accept the government's new reading of § 1225(b)(2), it would still be faced with Class Members due process challenge to the government's policies. Indeed, the Ninth Circuit has explicitly questioned the constitutionality of § 1225(b):

> We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so. Arbitrary civil detention is not a feature of our American government.

Rodriguez v. Marin, 909 F.3d 252, 256–57 (9th Cir. 2018) (alteration in original). The Court therefore must adopt an interpretation that avoids this grave constitutional concern.

### ii. Fourth Amendment

Additionally, the Court finds the government's interpretation raises serious concerns under the Fourth Amendment. Although immigration removal proceedings are civil, the Supreme Court has long acknowledged that immigration arrests and detentions are "seizures" within the meaning of the Fourth Amendment. United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). The INA authorizes immigration officers to make warrantless arrests in the interior of the country only in limited circumstances—and vests far greater warrantless search and seizure authority at the border than in the interior. For example, an immigration officer has authority, without a warrant, to arrest "any alien who in his view is *entering or attempting to enter* the United States in violation of any law regulating the admission, exclusion, expulsion, or removal of aliens" but the arrest of a noncitizen "in the United States" is only authorized if the arresting officer "has reason to believe that the alien arrested is in the United States in violation of any such law or regulation and is likely

to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2) (emphasis added); see also 8 U.S.C. §§ 1357(a)(4)–(5) (providing other circumstances that justify warrantless arrest). Similarly, immigration officers have authority to "conduct a search, without warrant, of the person, and of the personal effects in the possession of any person, and of the personal effects in the possession of any person *seeking admission* to the United States" if the officer has "reasonable cause to suspect that grounds exist for denial of admission to the United States . . . which would be disclosed by such search." 8 U.S.C § 1357(c) (emphasis added).

By distinguishing between searches and seizures of noncitizens "entering or attempting to enter the United States" or "seeking admission to the United States" in § 1357, the INA captures the so-called "border search exception," which recognizes "[t]hat searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact *that they occur at the border*." United States v. Ramsey, 431 U.S. 606, 616 (1977) (emphasis added). Under the Fourth Amendment, "the expectation of privacy [is] less at the border than in the interior . . . [and] the balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government[.]" United States v. Montoya de Hernandez, 473 U.S. 531, 539–40 (1985) (citations omitted). It is therefore accepted that individuals inspected at the border should expect that they will be deemed noncitizens until they can prove otherwise—which is what § 1225(b)(2)(A) requires. But interpreting § 1225(b)(2)(A) to apply *in the interior* and authorize ICE officers to arrest and detain a suspected individual if they cannot show the officer that they are "clearly and beyond a doubt entitled to be admitted" eviscerates the distinction between the border and interior for Fourth Amendment purposes.

Take, for example, the government's insistence that "applicant for admission" and "seeking admission" are synonymous in § 1225(b)(2)(A) such that anyone present in the country without having been admitted is seeking admission. As a matter of statutory construction, the term "seeking admission" should be given the same meaning as in § 1357. Robers v. United States, 572 U.S. 639, 643 (2014) ("Generally, identical words used in different parts of the same statute are . . . presumed

to have the same meaning.").[20] In line with the long-recognized border search exception to the Fourth Amendment, courts and Ninth Circuit jurists have interpreted "seeking admission" under § 1357(c) to permit warrantless searches under the Fourth Amendment because they occur *at the border*. See, e.g., United States v. Cano, 973 F.3d 966, 973 (9th Cir. 2020) (Bennett, J., joined by Callahan, M. Smith, R. Nelson, Bade, and Vandyke, JJ., dissenting from the denial of rehearing *en banc*) (interpreting § 1357(c)'s authorization of warrantless searches of "any person seeking admission to the United States" as arising from the government's "inherent power to protect . . . the border."); United States v. Castellanos, 518 F.3d 965, 971 (8th Cir. 2008) (interpreting "seeking admission" in § 1357 as pertaining to circumstances where individuals are attempting to enter the United States); cf. United States v. Nevarez-Alcantar, 495 F.2d 678 (10th Cir. 1974) (interpreting "any person seeking admission" under § 1357(c) to authorize a Border Patrol Agent to conduct a warrantless search of a suitcase in in the possession of a person who was in transit from the border and apprehended within 48 miles of it). But if, as the government contends, all noncitizens present in the U.S. without admission are "seeking admission" under § 1225(b)(2)(A), then by extension, ICE officers can conduct warrantless searches of suspected noncitizens anywhere in the U.S. under § 1357(c). The government's construction thus raises serious concerns under the Fourth Amendment.

These concerns are avoided by reading § 1225(b) to apply at the border and § 1226(a) to apply where noncitizens are apprehended within the country's interior, because § 1226(a) provides significant protections against unreasonable searches and seizures by ICE officers. Under 8 C.F.R. § 236.1, an individual may be arrested and detained pursuant to an administrative I-200 warrant issued by an authorized official who states that he or she has "probable cause to believe" the named noncitizen is removable. See N.S. v. Dixon, 141 F.4th 279, 282–283 (D.C. Cir. 2025) (citing 8 C.F.R. § 236.1(a); id. § 287.5(e) (listing categories of officers so authorized)). To execute an I-200

_____

[20] Inexplicably, the Eighth Circuit majority waived away the statutory inconsistency created by its interpretation of "seeking admission" in § 1225(b)(2)(A) with its prior interpretation of that identical phrase in § 1357(c) in United States v. Castellanos, 518 F.3d 965, 971 (8th Cir. 2008) by saying § 1357(c) is a "different statute." Avila, 2026 WL 819258 at *5 n. 5. But both §§ 1225 and 1357 are provisions of the INA that were amended through IIRIRA. See Pub. L. 104-208.

form, an immigration officer of a type listed in the regulation must have "successfully completed basic immigration law enforcement training." Id. (citing 8 C.F.R. § 287.5(e)(3); § 287.5(c)(1) (same required before making an arrest under 8 U.S.C. § 1357(a)(2))). Regulations further provide that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii). A properly signed and served I-200 administrative warrant represents a finding by an authorized supervisory officer that there is probable cause to believe a specific individual is removable from the United States. See Castañon Nava v. Dep't of Homeland Sec., 806 F.Supp.3d 823, 851 (N.D. Ill. 2025).

But no administrative warrant requirements exist in the text of § 1225(b)(2)(A) or its implementing regulations. The government's interpretation of that provision as geographically unlimited is thus in tension with the application of the Fourth Amendment within the country's interior, which "requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force." Trump v. Illinois, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring).

The record before the Court demonstrates that the government's policies authorize ICE officers to arrest Class Members in the interior of the country without a warrant and without probable cause. For example, there is no evidence Named Plaintiffs were arrested pursuant to a properly executed and served I-200 warrant. In fact, it is undisputed that Plaintiff Guevara-Alcantar who was taken into ICE custody on August 26, 2025, was not even served with a Notice to Appear, the charging document that sets forth the basis for DHS' allegation that he is inadmissible, until Thursday, October 30, 2025, *months* after his initial arrest and detention. See Kagan Decl. ¶ 27, ECF No. 15-2. That is consistent with the government's detention policy under § 1225(b)(2)(A), because the issuance of a Notice to Appear prior to or upon arrest is only required under § 1226(a)'s implementing regulations. See 8 C.F.R § 236.1(b). Similarly, the government took the position before the Seventh Circuit that it has authority to arrest and detain noncitizens like Class Members without a warrant under § 1225(b)(2)(A). See Castañon-Nava, 161 F.4th at

1062 ("Defendants are not likely to succeed on the merits of their argument that those individuals, whom ICE arrested without a warrant, are subject to mandatory detention under § 1225(b)(2)(A).").

Given Class Members are apprehended and arrested in the interior of the country, not at the border, the government's policies raise serious concerns under the Fourth Amendment. As Judge Douglas explained, that Congress would wish to provide noncitizens who have been living in the country with the greater procedural protections available under § 1226(a) recognizes that "government intrusions have always been tolerated at the border that would be intolerable in the interior, for the obvious reason that citizens and noncitizens alike expect to be able to go about their business without having to show that they are 'clearly and beyond doubt entitled to be admitted' if taken, or mistaken, for an otherwise inadmissible noncitizen." Buenrostro-Mendez, 166 F.4th at 520 (Douglas, J., dissenting) (quoting 8 U.S.C. § 1225(b)(2)(A)). Or, as the Supreme Court put it, in considering the constitutionality of a warrantless search by Border Patrol, which the government justified under § 1357(a)(3):

> It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. To recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials: "These (Fourth Amendment rights), I protest, are not mere second-class rights but belong in the catalog of indi[s]pensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government."

Almeida-Sanchez v. United States, 413 U.S. 266, 274 (1973) (citation omitted) (alterations in original). These principles must prevail in the face of the current Administration's claim to unprecedented search and seizure power anywhere in the country based on an—at best, colorable—interpretation, as a matter of definitional possibility, of the phrases "applicant for admission" and "seeking admission."

Given the grave constitutional concerns raised by the government's interpretation of § 1225(b)(2)(A), and the availability of the above-described more reasonable interpretation that

avoids such concerns, the Court *must* reject the government's statutory reading and the detention policies that flow from it. Torres, 976 F.3d at 923 (the INA is to be read "against the backdrop of our constitutional principles") (citation omitted).

### 4. Agency Practice and Major Questions

Finally, the Court finds the Supreme Court's "major questions" cases militate against the government's claim to "broad, expansive power on an uncertain statutory basis" in this context. Learning Res., Inc. v. Trump, 607 U.S. ----, 24–1287, 2026 WL 477534, at *7 (U.S. Feb. 20, 2026). "In each . . . the statutory text might 'as a matter of definitional possibilities' have been read to delegate the asserted power." Id. (quoting West Virginia v. EPA, 597 U.S. 697, 721, 723 (2022). "But 'context' counseled 'skepticism.'" Id.

As discussed, Defendants' policies, which unearth a vast but hidden mandatory detention authority in a long extant statute, *subject millions[21] of people living in the U.S. to prolonged detention*. This is a decision of "vast economic and political significance," and the "history and breadth" of civil immigration detention authority, wherein noncitizens in Class Members position have been eligible for release on bond, provide "reason to hesitate before concluding that Congress meant to confer such authority." West Virginia v. EPA, at 721, 723 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159–60 (2000)); see also Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power . . . [the courts] typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (citations omitted).

With regards to economic significance, the prolonged detention of millions will certainly lead to increased federal costs. See Demore v. Kim, 538 U.S. 510, 518 (2003) ("[C]onfinement of criminal aliens alone cost $724 million in 1990."); see also Hernandez v. Sessions, 872 F.3d, 976, 996 (2017) (Noting in 2017 the daily cost of immigration detention was $6.5 million, compared to the cost of supervised release on bond at between 17 cents and 17 dollars each day per person).

---

[21] The estimated population of noncitizens in the United States who entered without inspection is around six million today. Jill Wilson, *et al.*, CONG. RSCH. SERV., R47848, Nonimmigrant Overstays: Overview and Policy Issues, at 1 n.6 (2023).

Recent estimates by the federal government find that supervised release programs such as those available under § 1226 cost less than $4.20 each day per participant, compared with detention costs of $152 per day. Am. Immigr. Lawyers Ass'n, Featured Issue: Immigration Detention and Alternatives to Detention (Mar. 14, 2025), https://www.aila.org/library/featured-issue-immigration-detention-and-alternatives-to-detention [https://perma.cc/U3RR-WYWH].

In addition to the costs of detention itself, nineteen states, including Nevada, have described how "[d]etention of noncitizens during removal proceedings also deprives states and localities of noncitizens' substantial economic contributions." Brief for States of New York, *et al.*, as Amici Curiae in Support Plaintiff-Appellee and Affirmance, Rodriguez Vazquez v. Hermosillo, No. 25-6842, Dkt. No. 40.1 at 10-12 (9th Cir. Jan. 28, 2026) (Summarizing data reflecting undocumented immigrants like Class Members in 2023 paid nearly $90 billion in taxes, added almost $300 billion to the economy as consumers, and contributed billions of dollars to programs such as Social Security and Medicare; "[a]ll these contributions are lost when these individuals are unnecessarily detained.")

Likewise, the government's detention policies are generating significant political controversy as record-breaking numbers of people are held in ICE detention and the number of reported deaths in immigration custody since the government's policies took effect has risen dramatically. See United States Senate, Senator Hickenlooper, *et al.*, Letter to DHS Secretary Noem and Acting Director Lyons (Feb. 13, 2026), https://www.hickenlooper.senate.gov/wp-content/uploads/2026/02/2026-02-13-Letter-to-DHS-ICE-re-Deaths-in-Detention.pdf [https://perma.cc/D4X5-TJPN]. Current data indicates the government's detention policies have resulted in the detention of parents of over 11,000 U.S. citizen children, with devastating economic and social effects. See Jeff Ernsthausen, *et al.*, Trump Has Detained the Parents of More Than 11,000 U.S. Citizen Kids, PROPUBLICA (Mar. 23, 2026, 5:30 a.m.) https://www.propublica.org/article/trump-family-deportations-ice-citizen-kids [https://perma.cc/3H88-CVDK].

So, although the government asserts that "prior agency practice applying § 1226(a) to [Class Members] is unavailing" because "under Loper Bright, the plain language of the statute and

not prior practice controls," the government's sharp departure from decades of consistent prior practice and precedent weighs on a matter of such profound economic and political significance powerfully against its interpretation. Defs.' Opp'n 17, ECF No. 87 (citing Hurtado, 20 I. & N. Dec. at 225-26). Likewise, the fact that the government's abrupt change in position is inconsistent with existing regulations governing IJs' bond jurisdiction, is further evidence of its unlawfulness. See, e.g., 8 C.F.R. § 1003.19(h)(2) (limiting an IJ's bond jurisdiction only over certain classes of noncitizens such as *arriving* noncitizens and those encompassed § 1226(c)).  Indeed, in Hurtado the BIA drastically departs from prior BIA precedent, without acknowledging that departure. Hurtado contradicts a BIA decision designated as precedential a month before it was issued. See Matter of Akhmedov, 29 I. & N. Dec. 166 (BIA 2025) (stating unequivocally that a noncitizen who entered the country without inspection in January 2022 was detained pursuant to 8 U.S.C. § 1226(a)).

Thus, under Loper Bright, the government's interpretation of § 1225(b)(2) in the July 8th Memo and Hurtado is unpersuasive. See Murillo-Chavez v. Bondi, 128 F.4th 1076, 1087 (9th Cir. 2025) (noting that after Loper Bright, courts may only look to agency interpretation as persuasive and "may not defer to an agency interpretation of the law simply because a statute is ambiguous.") (citing Loper Bright, 603 U.S. at 413). And this Court's finding that the government's policies violate the INA is informed by the Supreme Court's instruction "that courts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court," and caution that "[a] longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred." Biden v. Nebraska, 600 U.S. 477, 519 (2023) (Barrett, J., concurring) (first quoting Bittner v. United States, 598 U.S. 85, 97 (2023); and then quoting FTC v. Bunte Brothers, Inc., 312 U.S. 349, 352 (1941)).

For these reasons, the Court finds that Class Members are subject to detention under § 1226(a) and entitled to its procedural protections, including consideration for release on bond. Accordingly, the DHS and DOJ policies enacted in the July 8th Memo and Hurtado violate the INA, are therefore "not in accordance with law" under the APA U.S.C. § 706(2)(A), and Plaintiffs

are entitled to partial judgment to that effect as a matter of law.

### D. Scope of Relief

As this Court previously found and hereby incorporates, 8 U.S.C. 1252(f)(1) does not limit the Court's authority to issue the classwide declaratory relief requested by Plaintiffs and set aside Defendants' policies in the July 8th Memo and Hurtado (*i.e.* vacatur) pursuant to § 706(2) of the APA. See Class Cert. Order 37–41, ECF No. 71.

Accordingly, the Court issues a classwide declaratory judgment that Class Members are subject to detention under § 1226(a) and its implementing regulations. Defendants must therefore comply with 8 C.F.R. §§ 236.1(b); 236.1(c)(8) in arresting and detaining any Class Member. If Defendants deny release on bond or conditional parole after an initial custody determination, Class Members are entitled to custody redetermination(s) before an immigration judge upon request consistent with 8 C.F.R. §§ 236.1(d); 1003.19.

The Court further "set[s] aside" the July 8th Memo and Hurtado pursuant to 5 U.S.C. § 706(2). In doing so, the Court declares that those agency actions were "unlawful and returns the world to the *status quo*, before the unlawful action[s]." Nat'l TPS All. v. Noem, 166 F.4th 739, 760 (9th Cir. 2026) ["NTSPA III"]. Although the government has not raised an argument that this Court lacks authority to set aside its nationwide policies due to the Supreme Court's decision in Trump v. CASA, Inc., 606 U.S. 831 (2025), it has made that argument before the Ninth Circuit in an emergency motion to stay the district court's February 18, 2026 Order granting petitioners motion to enforce judgment and vacating Matter of Yajure Hurtado. See Bautista v. U.S. Dep't of Homeland Sec., No. 26-1044, Dkt. No. 4 (9th Cir. Feb. 26, 2026). The government also argued the Bautista court's vacatur of Hurtado was procedurally improper for unrelated reasons, not relevant here. The Ninth Circuit granted a temporary administrative stay pending a ruling on the government's emergency motion for a stay pending appeal. Bautista v. U.S. Dep't of Homeland Sec., No. 26-1044, Dkt. No. 5.1 (9th Cir. Mar. 6, 2026). The Court thus finds it pertinent to consider its authority to vacate the July 2025 Memo and Hurtado nationwide, as Plaintiffs request. See Pls.' Mot. 17–18, ECF No. 74.

Defendants do not argue that this Court could or should somehow limit its vacatur of the

July 8th Memo and Hurtado, which they have confirmed apply uniformly nationwide, to Class Members. The Supreme Court has affirmed decisions that vacated agency actions, rather than enjoined their enforcement as to the specific plaintiffs. See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1 (2020). "And the D.C. Circuit—which handles the lion's share of the country's administrative law cases" has long held "[w]hen a reviewing court determines that agency [actions] are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed." Corner Post, Inc. v. Bd. Of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) (quoting Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).

As the Ninth Circuit noted in NTPSA III, see 166 F.4th at 767, CASA declined to reach the question of whether its logic extends to relief under § 706(2), though Justice Kavanaugh suggested that district courts retained the ability to "set aside an agency rule under the APA," even if such relief would be the "functional equivalent of a universal injunction." CASA, 606 U.S. at 873 (Kavanaugh, J., concurring); see also id. at 847 n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.") (citing 5 U.S.C. § 706(2)). The Ninth Circuit expressly declined to resolve this question where it found it "would be impossible [for the district court] to grant complete relief to the plaintiffs [NTPSA's nationwide members] short of a full set aside." NTPSA III, 166 F.4th at 768. In this case, it may be possible to limit the Court's vacatur to only apply to Class Members, i.e., noncitizens who have been or will be subject to removal proceedings before immigration courts in the District of Nevada. But such a limitation poses serious concerns as to Class Members receiving complete relief.[22] Nevertheless, given the Ninth Circuit is likely to resolve this issue soon, the Court will limit its set aside of Defendants' policies to Class Members, pending resolution of the government's appeal in Bautista v. U.S. Dep't of Homeland Sec., No. 26-1044 (9th Cir.). Plaintiffs are granted leave to move to lift the stay in the event they believe the Court

---

[22] For example, Class Members entitled to relief include individuals arrested and transferred from custody in other jurisdictions, such as Utah, Idaho, and Montana. Likewise, Class Members include individuals who have been transferred from the District of Nevada to other jurisdictions since Plaintiffs filed their Class Action Complaint in October of 2025.

should reconsider, or the Ninth Circuit issues further guidance in the interim.

### E.  Final Judgment Pursuant to Rule 54(b)

"When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54. "In deciding whether there are no just reasons to delay the appeal of individual final judgments in a setting such as this, a district court must take into account judicial administrative interests as well as the equities involved." Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980). Where "the claims under review [are] separable from the others remaining to be adjudicated" and "the nature of the claims already determined [is] such that no appellate court would have to decide the same issues more than once" certifying a partial final judgment is appropriate. Id. at 2. Here, if Plaintiffs prevail on any appeal of their statutory and regulatory claims, there will be no need for the Court to address Plaintiffs' remaining Due Process claim or their claim that Defendants' policies are arbitrary and capricious under the APA. Further, the equities present—namely the irreparable harms Class Members face if they continue to be arrested and detained in violation of the INA and its implementing regulations—favor expeditious resolution of the central statutory question in this case.

### F.  Notice to Class Members

Federal Rule of Civil Procedure 23(d) permits a court to issue orders on "procedural matters" to "protect class members and fairly conduct the action." Fed. R. Civ. P. 23(d)(1)(B), (E). This includes entering orders "giving appropriate notice to some or all class members" of "any step in the action[.]" Fed. R. Civ. P. 23(d)(1)(B)(i); see also Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment ("Notice is available fundamentally for the protection of the members of the class or otherwise for the fair conduct of the action[.]"); id. ("Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion."). Plaintiffs have submitted a proposed notice to Class Members and Defendants have not objected to that proposal. The Court finds the issuance of notice to Class Members regarding

the Court's partial judgment is necessary to protect the interests of Class Members and ensure they receive the benefit of the classwide relief. Therefore, the Court orders Defendants to provide the form notice attached to this Order as Appendix B to Class Members.

**VII.    CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs-Petitioners' (ECF No. 74) Motion for Partial Summary Judgment is **GRANTED**. The Court **ORDERS** as follows:

1. Summary judgment is **GRANTED** in favor of Plaintiffs on Ground I, Ground II, and **IN PART** on Ground III ("not in accordance with law" under § 706(2)(A));

2. "Class Members" are:

All noncitizens in the U.S. without lawful status (1) who are or will be arrested or detained by ICE; (2) who are or will be in removal proceedings before an Immigration Court within the District of Nevada; (3) whom DHS alleges or will allege to have entered the United States without inspection or parole; (4) who are not or will not be subject to detention under 8 U.S.C. §§ 1226(c), 1225(b)(1), or 1231 at the time they are scheduled for or request a bond hearing; and (5) whose most recent arrest by ICE occurred inside the United States and not while arriving in the United States.

3. The Court issues the following **Declaratory Judgment:**

Class Members are subject to detention under 8 U.S.C. § 1226(a) and its implementing regulations 8 C.F.R. §§ 236.1, 1236.1 & 1003.19. Class Members are not subject to detention under 8 U.S.C. § 1225(b)(2)(A). Class Members are thus entitled to consideration for release from detention on bond and/or conditions by immigration officers and immigration judges.

Defendants' policies subjecting Class Members to detention under 8 U.S.C. § 1225(b)(2)(A) pursuant to the July 8, 2025 ICE Memo "Interim Guidance Regarding Detention Authority for Applicants for Admission" and Matter of Yajure Hurtado, 29 I. & N. Dec. 216 (BIA 2025) are unlawful under the Immigration and Nationality Act and its implementing regulations.

**The Clerk of Court is kindly instructed to enter partial judgment accordingly.**

**IT IS FURTHER ORDERED** that the July 8, 2025 ICE Memo "Interim Guidance Regarding Detention Authority for Applicants for Admission" and Matter of Yajure Hurtado, 29 I. & N. Dec. 216 (BIA 2025) are **VACATED** pursuant to 5 U.S.C. § 706(2).

**IT IS FURTHER ORDERED** that the Court's **VACATUR** of the July 8, 2025 ICE Memo and Matter of Yajure Hurtado is **STAYED**, **except as to Class Members**, **PENDING APPEAL**

in Bautista v. U.S. Dep't of Homeland Sec., No. 26-1044 (9th Cir.).

**IT IS FURTHER ORDERED** that Defendants must provide notice of the Court's judgment using the form attached to this Order as Appendix B ("the Notice") to Class Members as follows:

(1) By **April 14, 2026**, Defendants must individually provide (1) the Notice; (2) the template habeas petition at ECF No. 95-2; and (3) a copy of this Order and judgment to all noncitizens charged as inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) who are currently detained and subject to removal proceedings before an immigration court in the District of Nevada. Defendants must provide the Notice in a language which the noncitizen can understand. Should Defendants not have the notice translated into a language the noncitizen understands, they shall secure an interpreter to translate the notice as soon as feasible;

(2) By **April 7, 2026**, Defendants shall post the notice in English and Spanish in common areas of any facility holding immigration detainees in Nevada or in any geographic area over which, as of October 30, 2025, an Immigration Court located in Nevada is the administrative control court;

(3) By **April 7, 2026**, Defendants shall promptly serve the Notice on all noncitizen who are newly detained by immigration officers and who Defendants reasonably believe may be Class Members. The Notice shall be given at the time the noncitizen is processed in a language the noncitizen understands. Should Defendants not have the Notice translated in a language the noncitizen understands, they shall secure an interpreter to translate the Notice as soon as feasible;

(4) Defendants shall record the service of each Notice and retain a copy of each Notice served.

**IT IS FURTHER ORDERED** that a **Status Conference** is set for **April 2, 2026** at **1:15 p.m.** in Las Vegas Courtroom 7C, before the Honorable Richard F. Boulware, II. A representative for the Federal Public Defender for the District of Nevada (FPD) is instructed to appear to discuss assisting and/or representing individual Class Members who may file habeas petitions to enforce this Court's Order and partial judgment. **The Clerk of Court is instructed to send a copy of this Order to the FPD.**

- 59 -

Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is **INSTRUCTED** to update the docket and case caption to reflect the following substitutions of Defendants: (1) Secretary of Homeland Security Markwayne Mullin is substituted for Kristi Noem; (2) Daren K. Margolin, Director of the Executive Office for Immigration Review, is substituted for Sirce Owen; (3) Ruben Leyva, Acting Field Office Director of the Salt Lake City Field Office of ICE Enforcement and Removal Operations, is substituted for Jason Knight.

**DATED:** March 30, 2026.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

**APPENDIX A**

1. Simental v. Knight, No. 2:26-CV-00205-RFB-NJK, 2026 WL 313336 (D. Nev. Feb. 5, 2026);

2. Trejo v. Knight, No. 2:26-CV-00197-RFB-DJA, 2026 WL 381975 (D. Nev. Feb. 11, 2026);

3. Becerra Diaz v. Knight, No. 2:26-CV-00247-RFB-DJA, 2026 WL 412483 (D. Nev. Feb. 12, 2026);

4. Escamilla-Lopez v. Holston, No. 2:26-CV-00242-RFB-BNW, 2026 WL 412473 (D. Nev. Feb. 12, 2026);

5. Sermeno v. Noem, No. 3:26CV00084-RFB-CLB, 2026 WL 396508 (D. Nev. Feb. 12, 2026);

6. Chama v. Noem, No. 3:26CV00081-RFB-CSD, 2026 WL 396506 (D. Nev. Feb. 12, 2026);

7. Morales-Hernandez v. Noem, No. 3:26CV00079-RFB-CSD, 2026 WL 396497 (D. Nev. Feb. 12, 2026);

8. Aguirre Solis v. Noem, No. 2:26-CV-00053-RFB-EJY, 2026 WL 396432 (D. Nev. Feb. 12, 2026);

9. Figueroa v. Mattos, No. 2:26CV00184-RFB-MDC, 2026 WL 432582 (D. Nev. Feb. 16, 2026);

10. Matias-Gonzalez v. Noem, No. 2:26-CV-00326-RFB-MDC, 2026 WL 458459 (D. Nev. Feb. 18, 2026);

11. Lemus v. Knight, No. 2:26-CV-00299-RFB-BNW, 2026 WL 464540 (D. Nev. Feb. 18, 2026);

12. Carrillo-Figueroa v. Noem, No. 2:26-CV-00328-RFB-BNW, 2026 WL 464535 (D. Nev. Feb. 18, 2026);

13. Segura-Tuquinga v. Hogan, No. 2:26-CV-00283-RFB-DJA, 2026 WL 464533 (D. Nev. Feb. 18, 2026);

14. Pineda v. Noem, No. 2:26-CV-00306-RFB-NJK, 2026 WL 458458 (D. Nev. Feb. 18, 2026);

15. Rodriguez v. Noem, No. 3:26-CV-00090-RFB-CSD, 2026 WL 458389 (D. Nev. Feb. 18, 2026);

16. Villeda v. Noem, No. 2:26CV00302-RFB-EJY, 2026 WL 458360 (D. Nev. Feb. 18, 2026);

17. Ramirez-Rosales v. Noem, No. 2:26-CV-00327-RFB-NJK, 2026 WL 468278 (D. Nev. Feb. 18, 2026);

18. Matias-Gonzalez v. Noem, No. 2:26-CV-00326-RFB-MDC, 2026 WL 458459 (D. Nev. Feb.

18, 2026);

19. Pacheco-Sanchez v. Holston, No. 2:26-CV-00330-RFB-NJK, 2026 WL 483453 (D. Nev. Feb. 20, 2026);

20. Ramirez-Ramos v. Noem, No. 2:26-CV-00332-RFB-MDC, 2026 WL 496688 (D. Nev. Feb. 22, 2026);

21. Hernandez v. Bernacke, No. 2:26-CV-00355-RFB-NJK, 2026 WL 497340 (D. Nev. Feb. 23, 2026);

22. Ramos-Robles v. Noem, No. 2:26-CV-00333-RFB-NJK, 2026 WL 496687 (D. Nev. Feb. 23, 2026);

23. Perez v. Bondi, No. 2:26-CV-00315-RFB-DJA, 2026 WL 509441 (D. Nev. Feb. 24, 2026);

24. Barcenas-Francisco v. Holston, No. 2:26-CV-00329-RFB-DJA, 2026 WL 515709 (D. Nev. Feb. 24, 2026);

25. Godinez v. Noem, No. 2:26-CV-00362-RFB-BNW, 2026 WL 515706 (D. Nev. Feb. 24, 2026);

26. Mora-Espejo v. Noem, No. 2:26-CV-00372-RFB-BNW, 2026 WL 509526 (D. Nev. Feb. 24, 2026);

27. Navarro v. Mattos, No. 2:26-CV-00359-RFB-BNW, 2026 WL 509443 (D. Nev. Feb. 24, 2026);

28. Garcia Rincon v. Noem, No. 2:26-CV-00396-RFB-BNW, 2026 WL 538327 (D. Nev. Feb. 25, 2026);

29. Gaytan Castro v. Knight, No. 2:26-CV-00445-RFB-EJY, 2026 WL 554592 (D. Nev. Feb. 26, 2026);

30. Bueno-Robles v. Noem, No. 2:26-CV-00449-RFB-MDC, 2026 WL 543823 (D. Nev. Feb. 26, 2026);

31. Arroyo Lucas v. Noem, No. 2:26-CV-00465-RFB-BNW, 2026 WL 579417 (D. Nev. Mar. 2, 2026) (three petitioners);

32. Ramirez Mendez v. Knight, No. 2:26-CV-00375-RFB-DJA, 2026 WL 579413 (D. Nev. Mar. 2, 2026);

33. Ruiz Rodriguez v. Mattos, No. 2:26-CV-00316-RFB-EJY, 2026 WL 579412 (D. Nev. Mar. 2,

2026);

34. Avalos Gonzalez v. Mattos, No. 2:26-CV-00462-RFB-DJA, 2026 WL 594809 (D. Nev. Mar. 3, 2026);

35. Flores Flores v. Mattos, No. 2:26-CV-00354-RFB-MDC, 2026 WL 594808 (D. Nev. Mar. 3, 2026);

36. Alvear Carcamo v. Noem, No. 2:26-CV-00463-RFB-MDC, 2026 WL 622732 (D. Nev. Mar. 5, 2026)

37. Villatoro v. Bernacke, No. 2:26-CV-00537, 2026 WL 638485 (D. Nev. Mar. 6, 2026);

38. Alfaro Quintanilla v. Noem, No. 2:26-CV-00541-RFB-NJK, 2026 WL 637096 (D. Nev. Mar. 6, 2026);

39. Hernandez v. Mattos, No. 2:26-CV-00365-RFB-EJY, 2026 WL 658904 (D. Nev. Mar. 9, 2026);

40. Mendez Vazquez v. Mattos, No. 2:26-CV-00262-RFB-BNW, 2026 WL 658896 (D. Nev. Mar. 9, 2026);

41. Lemus Vazquez v. Bondi, No. 2:26-CV-00182-RFB-DJA, 2026 WL 686838 (D. Nev. Mar. 11, 2026);

42. Cardenas Dorantes v. Noem, No. 2:26-CV-00650-RFB-MDC, 2026 WL 752649 (D. Nev. Mar. 17, 2026);

43. Alfaro Morales v. Noem, No. 2:26-CV-00585-RFB-MDC, 2026 WL 776986 (D. Nev. Mar. 19, 2026);

44. Contreras Gamboa v. Noem, No. 3:26-CV-00175-RFB-CSD, 2026 WL 776804 (D. Nev. Mar. 19, 2026);

45. Rubio Gomez v. Bondi, No. 2:26-CV-00264-RFB-BNW, 2026 WL 788805 (D. Nev. Mar. 20, 2026);

46. Barraza Chavez v. Knight, No. 2:26-CV-00743-RFB-MDC, 2026 WL 811518 (D. Nev. Mar. 24, 2026);

47. Santeliz Meza v. Noem, No. 2:26-CV-00706-RFB-DJA, 2026 WL 811503 (D. Nev. Mar. 24, 2026);

48. Avila-Paredes v. Holston, No. 2:26-CV-00699-RFB-EJY, 2026 WL 822477 (D. Nev. Mar. 25, 2026);

49. Bonifaz-Morales v. Bondi, No. 2:26-CV-00761-RFB-BNW, 2026 WL 822493 (D. Nev. Mar. 25, 2026);

50. Castellanos Arellano v. Knight, No. 2:26-CV-00741-RFB-EJY, 2026 WL 822480 (D. Nev. Mar. 25, 2026).

**APPENDIX B**

## CLASS ACTION NOTICE

### United States District Court for the District of Nevada (Case No. 25-cv-02136)

**BACKGROUND:**

A lawsuit was filed in federal court in Nevada, *Jacobo-Ramirez v. Noem*, No. 25-cv-02136 (Nev. 2025), challenging the Department of Homeland Security (DHS) and Executive Office for Immigration Review's (EOIR) policies that certain people must be detained in custody without the opportunity to ask an Immigration Judge for release on bond while waiting to resolve their case in Immigration Court. These DHS and EOIR policies applied to people who entered the United States without being admitted or inspected.

On March 30, 2026, the Court issued a ruling that these DHS and EOIR policies are unlawful. Under the court's order, anyone who is a member of the group in the lawsuit, called a "class member", must be considered for release on bond and must receive a bond hearing in front of an Immigration Judge if they request one.

**NOTICE:**

You may be a member of the class that was certified by the judge in this case. Receiving this notice does not mean you are a class member; it means that you *might* be a class member. Class members may request release on bond or conditional parole by immigration officers and may ask for a bond hearing in Immigration Court. At the bond hearing, the Immigration Judge may determine that the class member is eligible to be released on bond while their removal proceedings are pending.

**YOU MAY BE A CLASS MEMBER IF YOU MEET ALL OF THE FOLLOWING:**

1. You do not have lawful status in the United States;
2. You are in removal proceedings before an Immigration Court within the District of Nevada or were in removal proceedings before an Immigration Court within the District of Nevada on or after October 30, 2025;
3. You entered the United States without inspection;
4. Your most recent arrest did not occur upon arrival to the United States;
5. You are not in expedited removal proceedings;
6. You are not in mandatory detention due to certain criminal charges or convictions; and
7. You do not have a final order of removal or a reinstated order of removal.

**ATTACHED DOCUMENTS**

The District Court's order and judgment are included with this notice. This notice may be presented to the Immigration Court as proof that you may be a class member who has the right to a bond hearing.

If you are denied a bond hearing in Immigration Court after asking for one or were told that the Immigration Court does not have jurisdiction, you may seek individual relief by filing a petition in federal court in Nevada. A template petition for habeas corpus is included with this notice.

Served on date: _____

Served at location: _____

Name of person served: _____

Alien number of person served: _____

Name of officer serving notice: _____

ID number of officer serving notice: _____

Signed by serving officer: _____